William MALLORY, et al.,
Plaintiffs–Appellants,

v.

George C. EYRICH, et al.,
Defendants–Appellees.

No. 87–3838.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 20, 1987.

Decided Feb. 12, 1988.

Thomas I. Atkins (argued), Brooklyn, N.Y., for plaintiffs-appellants.

Andrew I. Sutter (argued), William J. Steele, Asst. Atty. Gen., Columbus, Ohio, James W. Harper (argued), Asst. Pros. Atty., Cincinnati, Ohio, for defendants-appellees.

Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and McRAE, District Judge.[*]

LIVELY, Chief Judge.

The principal question in this case is whether section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 (1982), applies to judicial elections. Section 2, as amended in 1982, provides:

> **§ 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**
>
> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
>
> (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

# I.

## A.

The plaintiffs are black residents of Cincinnati who are qualified to vote in judicial elections. The defendants are the governor and secretary of state of Ohio and the chairman and members of the Hamilton County Board of Elections. In 1965 the Ohio legislature merged the formerly separate Municipal Court of Cincinnati and Hamilton County Court into the Hamilton County Municipal Court. The judges of this consolidated court are elected at large for six-year terms, on a staggered basis, at elections held every two years simultaneously with elections for the Cincinnati city council and school board.

According to the 1980 census the black population of Cincinnati was 33.85% and that of Hamilton County as a whole was 19.01%. The complaint alleges that in the elections for municipal judges held since the merger of the two courts, every black candidate for municipal judge has received a significantly smaller percentage of the vote in the overwhelmingly white areas of the county outside Cincinnati than in Cincinnati itself. These sharp differences cannot be explained, according to the complaint, by factors other than the racial make-up of the areas. No black candidate has won a contested race for municipal judge against a white opponent when the electorate consisted of all the qualified voters of Hamilton County.

The plaintiffs sought certification of a class action and a declaration that the countywide election system violates the Equal Protection Clause of the Fourteenth

[*] The Honorable Robert M. McRae, Senior Judge, United States District Court for the Western District of Tennessee, sitting by designation.

Amendment, the guarantees of enfranchisement contained in the Fifteenth Amendment, the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Voting Rights Act of 1965, as amended, and the Equal Protection Clause of the Ohio Constitution. In addition, the complaint requested the district court to enter preliminary and permanent injunctions prohibiting the further use of the present procedures for electing judges of the Hamilton County Municipal Court, and an order "requiring the development and adoption of Cincinnati and Hamilton County judicial election plans and procedures which are free of racial bias and exclusivity."

**B.**

The parties filed cross-motions for summary judgment addressing the Voting Rights Act and constitutional claims and each filed memoranda in support and opposition. Following a hearing where counsel argued the motions, the court granted the defendants' motion for summary judgment and entered an order containing findings of fact and conclusions of law. After reviewing the language of section 2 of the Act and the purpose of the 1982 amendment, the district court stated in its order that there was sufficient evidence in the record to find in favor of the plaintiffs on the basis of the results of recent elections. However, the court concluded that section 2 does not apply to judicial elections, and granted judgment for the defendants on this basis.

The district court recognized that the 1982 amendment to section 2 was designed to broaden its coverage. Prior to the enactment of that amendment, section 2 prohibited the imposition or application of any voting qualification or prerequisite to voting or standard, practice, or procedure to "deny or abridge the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973 (1976). The Supreme Court had construed this language as requiring a showing of intent to deny or abridge the right to vote. See *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The amended

version prohibits the imposition or application of any such incidence of voting "which *results* in a denial or abridgement of the right ... to vote." 42 U.S.C. § 1973(a) (1982) (emphasis added). The purpose of the amendment was to eliminate any "intent" requirement and make it clear that a violation can be established by proof of discriminatory results alone. *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 2763, 92 L.Ed.2d 25 (1986).

**C.**

The district court based its determination that section 2 does not apply to judicial elections on two grounds. First, the court ascribed great significance to use of the word "representatives" in the 1982 amendment in describing how a violation of section 2 is established in a case claiming dilution of voting power. The amendment refers to members of a protected class having "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b) (1982). The court pointed to judicial statements that judges are not representatives of constituents in the same sense as legislators. *E.g., Buchanan v. Rhodes,* 249 F.Supp. 860 (N.D. Ohio 1966). The district court also relied on a one-man, one-vote case in holding that courts do not attempt to equalize the population of districts in judicial elections. *Buchanan v. Gilligan,* 349 F.Supp. 569 (N.D. Ohio 1972).

**II.**

Although the district court did not discuss the one-man, one-vote principle, the defendants have cited a number of cases for the proposition that the principle does not apply to judicial elections. We conclude that the one-man, one-vote cases do not control cases brought under the Voting Rights Act. The one-man, one-vote principle was enunciated in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), a case seeking an end to the malapportionment of state legislatures. The point of contention in *Reynolds v. Sims* was the population of different voting dis-

tricts, not their racial composition. By permitting the same number of officials to be chosen by the voters in voting districts having significantly different populations, the states involved in *Reynolds v. Sims* had diluted the votes of those voters living in the more heavily populated areas. The racial makeup of the districts was not an issue, and that is the sole issue in section 2 cases. Further, the one-man, one-vote cases address an equal protection problem directly under the Fourteenth Amendment. The plaintiffs' section 2 claim involves the construction of an Act of Congress, a different task from construing and applying a provision of the Constitution.

### III.

■■■ The district court relied principally upon the use of the word "representatives" in amended section 2. In doing so it overlooked many indications that such a restrictive reading is not warranted. The language of the original section 2 was absolute: *"No* voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed...." 42 U.S.C. § 1973 (1976) (emphasis added). No exceptions were expressed or implied. The 1965 Act also defined the terms "vote" and "voting" very broadly.

> The terms "vote" and "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.

Section 14, 42 U.S.C. § 1973*l* (c)(1). Candidates for elective judicial positions are unquestionably "candidates for public ... office." Thus, sections 2 and 14, taken together, strongly suggest that Congress intended to reach all voting and electoral practices that could be used to deny or abridge the right to vote in any election on the basis of race.

### A.

In upholding the constitutionality of the Voting Rights Act, the Supreme Court described the purpose of the Act in broad terms. "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting, which has infected the electoral process in parts of our country for nearly a century." *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). In *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Court summoned the legislative history in support of an expansive interpretation of the sweep of the Act. Chief Justice Warren wrote:

> The legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way. For example, § 2 of the Act, as originally drafted, included a prohibition against any "qualification or procedure." During the Senate hearings on the bill, Senator Fong expressed concern that the word "procedure" was not broad enough to cover various practices that might effectively be employed to deny citizens their right to vote. In response, the Attorney General said he had no objection to expanding the language of the section, as the word "procedure" "was intended to be all-inclusive of any kind of practice." Indicative of an intention to give the Act the broadest possible scope, Congress expanded the language in the final version of § 2 to include any "voting qualifications or prerequisite to voting, or standard, practice, or procedure." 42 U.S.C. § 1973 (1964 ed., Supp. I).

*Id.* at 566–67, 89 S.Ct. at 832–33 (footnote omitted). There is no hint in either of these opinions that any state or local election, whatever the office involved, is exempted from coverage of the 1965 Act.

## B.

The legislative history of the 1982 amendment is contained in Senate Report (S.Rep.) No. 97–417, 97th Congress 2d Sess., reprinted in 1982 U.S.Code Cong. & Admin.News at pages 177 et seq. The Supreme Court has referred to this Senate Report as an "authoritative source" for Congress's intent in amending section 2. *Thornburg v. Gingles*, 106 S.Ct. at 2763 n. 7. Again, everything contained in the report indicates that the 1982 amendment was intended to effect an expansion, rather than a contraction, of the applicability of the Act to state and local elections. The report states that the purpose of the 1982 amendment was to remove the restrictive reading given to section 2 in *City of Mobile v. Bolden,* and to make it clear that a plaintiff need not prove a discriminatory purpose to establish a violation—the adoption or maintenance of a system or procedure that results in a denial or abridgement of voting rights is sufficient. S.Rep. at 16, 27–28. There is nothing in this expressed purpose that indicates an intent to limit the applicability of the Act. In fact the report states that "Section 2 remains the major statutory prohibition of *all* voting rights discrimination." S.Rep. at 30, 1982 U.S. Code Cong. & Admin.News at 207 (emphasis added).

The 1982 amendment did not diminish the reach or effect of the original section 2 in any way. It is clearly a less onerous task to prove a violation on the basis of a head count than to be required to show discriminatory intent or purpose. This new "results" test is contained in amended section 2(a).

The 1982 amendment also added a new subsection (b) to section 2. The Senate Report states that "subsection (b) embodies the test laid down by the Supreme Court in *White* [*v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) ]." S.Rep. at 27, 1982 U.S.Code Cong. & Admin.News at 205. The language of subsection (b) tracks that used by the Supreme Court in *White*, a legislative reapportionment case decided before *Bolden*. *White* presented two issues, one a claim of violation of the one-

man, one-vote principle, and the other a claim of invidious discrimination against black and Mexican–American voters in the use of multimember legislative districts. The Supreme Court affirmed an order requiring these multimember districts to be redrawn as single member districts on the basis of the "totality of the circumstances" before the district court. 412 U.S. at 769, 93 S.Ct. at 2341. In *White* the Supreme Court articulated a results test for dilution claims and subsection (b) codified the "basic principle" of that decision. S.Rep. at 28.

Given the purpose of the 1982 amendment, we do not accept the restrictive reading ascribed to the word "representatives" by the district court. Subsection (a) of amended section 2 did not weaken the absolute and inclusive language of original section 2 in any way. In fact, it strengthened it. The addition of subsection (b), dealing with one form of abridgement—the dilution of a protected group's voting power—used language from the *White* opinion that dealt with state legislators, a group of public officials who are "representatives" in the restricted sense of being chosen to represent their constituents in making laws. In *White* the Supreme Court spoke of a group whose members had less opportunity than others "to participate in the political processes and to elect legislators of their choice." 412 U.S. at 766, 93 S.Ct. at 2339. Subsection (b) refers to groups whose members have less opportunity than others "to participate in the political process and to elect representatives of their choice." The only change was the substitution of "representatives" for "legislators."

It seems evident that Congress was seeking a broader word to make it clear that subsection (b) is not limited to legislative races. It chose "representatives," but could have chosen "candidates," "office seekers," or similar descriptive words. In fact, the Senate Report uses "candidates" and "elected officials" interchangeably with "representatives." See, *e.g.,* S.Rep. at 16 (use of "elected officials"); 28, 1982 U.S.Code Cong. & Admin.News p. 206 ("If as a result of the challenged practice or

structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect *candidates* of their choice, there is a violation of this section." (emphasis added)); 29 n. 115, 1982 U.S. Code Cong. & Admin.News p. 207 n. 115 ("[T]he election of a few minority *candidates* does not 'necessarily foreclose the possibility of dilution of the black vote,' in violation of this section." (emphasis added)); 30, 1982 U.S.Code Cong. & Admin. News p. 207 ("Of course, the ultimate test would be the White standard codified by this amendment of Section 2: whether, in the particular situation, the practice operated to deny the minority plaintiff an equal opportunity to participate and to elect *candidates* of their choice." (footnote omitted) (emphasis added)); 31, 1982 U.S.Code Cong. & Admin.News p. 208 ("The court should exercise its traditional equitable powers to fashion the relief so that it completely remedies the prior dilution of minority voting strength and fully provides equal opportunity for minority citizens to participate and elect *candidates* of their choice." (footnote omitted) (emphasis added)); 67, 1982 U.S.Code Cong. & Admin.News p. 246 ("The courts are to look at ... whether ... members of a protected class have the same opportunity as others to participate in the electoral process and to elect *candidates* of their choice." (emphasis added)).

We do not believe the word "representatives" in subsection (b) was used as a narrowing term of art. Such a treatment of the word in the context of the 1982 amendment is completely inconsistent with the purpose of the amendment to expand the application of the Act. Furthermore, this interpretation would limit the application of the original section 2, whereas amended subsection (a) repeated the broad and absolute language of original section 2 without limiting it in any way. We can find no basis in the language or legislative history of the 1982 amendment to support a holding that use of the word "representatives" was intended to remove judicial elections from the operation of the Act.

### C.

This conclusion is reenforced by the decision of a three-judge court, summarily af-firmed by the Supreme Court, in an action to enjoin a judicial election scheduled pursuant to legislative actions that had not been precleared under section 5 of the 1965 Act, 42 U.S.C. § 1973c. See *Haith v. Martin,* 618 F.Supp. 410 (E.D. N.C. 1985), *aff'd without opinion,* 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986). Section 5 requires certain states and their political subdivisions to obtain advance approval from the Attorney General of the United States, or by a declaratory judgment action in the United States District Court for the District of Columbia, for any alterations of voting qualifications and procedures in effect on November 1, 1964. Section 5 uses language nearly identical to that of section 2 in defining prohibited practices—"any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." In *Haith* the court held that section 5 of the Act applies to judicial elections:

As can be seen the Act applies to all *voting* without any limitation as to who, or what, is the object of the vote. The cases presented to the courts have dealt with what constitutes a "standard, practice, or procedure." Thus, in *Dougherty County, Georgia, Board of Education v. White,* the Supreme Court held that a newly enacted rule requiring employees seeking public office to take unpaid leaves of absence while campaigning was a "standard, practice, or procedure" requiring preclearance under section 5. 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978). The Court said that Congress meant "to reach any state enactment which altered the election law of a covered State even in a minor way." 439 U.S. at 37, 99 S.Ct. at 371, *quoting Allen v. State Board of Elections,* 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

We hold that the fact that an election law deals with the election of members of the judiciary does not remove it from the ambit of section 5.

618 F.Supp. at 413. In reaching this conclusion, the three-judge court quoted and

specifically relied upon the language of section 2. *Id.*

### D.

If further support for our conclusion is required, we note that the Attorney General, the officer responsible for enforcement of the Act, has consistently maintained that section 2 applies to judicial elections. In *Allen v. State Board of Elections*, 393 U.S. at 566–67, 89 S.Ct. at 832–33, the Supreme Court quoting Attorney General Nicholas Katzenbach, stated that section 2 "was intended to be all-inclusive of any kind of [voting] practice." In hearings before Congress prior to passage of the Act in 1965, the Attorney General stated that "every election in which registered voters are permitted to vote would be covered" by the Act. *Voting Rights: Hearing Before Subcommittee No. 5 of the House Judiciary Committee,* 89th Cong. 1st Sess. (1965), at 21. As recently as July 1987 the present Attorney General filed an amicus curiae brief in a case quite similar to the present one in which he argued that the plain language of the Act demonstrates that it applies to judicial elections and the 1982 amendments to section 2 were not intended to narrow the pre-existing coverage of that section, Brief for the United States in *Chisom v. Edwards* No. 87–3463, pending on appeal before the United States Court of Appeals for the Fifth Circuit. The Supreme Court stated in *United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 131, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978), that the contemporaneous construction of the Voting Rights Act by the Attorney General constitutes a compelling argument "especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to congress." (footnote and citations omitted).

### E.

There are two reported district court opinions that have decided this issue under amended section 2. In *Chisom v. Edwards,* 659 F.Supp. 183 (E.D.La.1987), the court held that section 2 does not apply to judicial elections, using reasoning similar to that of the district court in this case. As previously noted, *Chisom* is now before the Fifth Circuit on appeal. In *Martin v. Allain,* 658 F.Supp. 1183 (S.D. Miss. 1987), the district court rejected a restrictive reading of the word "representatives," and held that section 2 does apply to judicial elections. We agree with the reasoning and conclusion of the *Martin* court.

### IV.

### A.

The district court also granted summary judgment for the defendants on the plaintiffs' constitutional claims. It did so largely on the basis of this court's decision in *Gilday v. Board of Elections,* 472 F.2d 214 (6th Cir.1972). However, *Gilday* was concerned only with the disparity of population between the electoral districts of the courts in several Ohio counties. There was no issue of the denial of voting rights on the basis of race; it was a one-man, one-vote case seeking proportional representation.

While the *Gilday* plaintiffs relied on the Equal Protection Clause of the Fourteenth Amendment, the relief they sought was foreclosed by the settled principle that proportionality is not required with respect to judicial offices. However, there is no similar rule when the issue is one of racial discrimination and plaintiffs seek the elimination of racial barriers rather than proportional representation. Here the plaintiffs alleged that the system of electing judges to the Hamilton County Municipal Court "is intended to, and does, have the effect of denying Black voters equal protection under the Constitution and laws of the United States." More specifically, they alleged that the countywide election of municipal judges violated the Equal Protection Clause and has the effect of disenfranchising black residents of Hamilton County in violation of the Fifteenth Amendment. These allegations are sufficient to state a claim for relief. *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982).

The defendants denied the allegation of constitutional violations generally and the Hamilton County Board of Elections included the constitutional claims in its motion for summary judgment. The affidavit in support of the Board's motion took issue with statements in the affidavit filed by the plaintiffs in support of their motion for summary judgment. The question of intent was squarely in issue, but was not the basis of the district court's decision granting summary judgment to the defendants. The district court did not reach the question of intent, mistakenly holding that *Gilday* precluded consideration of any claim seeking a realignment of judicial districts. On remand the district court must consider the contested issue of intent unless it awards relief to the plaintiffs on their principal claim under section 2 of the Voting Rights Act.

### B.

The district court did not rule on the plaintiffs' request for class action certification. On remand, the district court should address this request in view of our decision that summary judgment was not proper.

### C.

As previously noted, the district court stated in its order that the record would support granting relief to the plaintiffs under a "results" standard. The plaintiffs urge us to treat this as the district court's ultimate finding if we conclude that section 2 applies, and remand only for development of an appropriate remedy. Since the case was decided by the district court on summary judgment without a fully developed record, we believe the better course is to remand on all issues.

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

WELLFORD, Circuit Judge, concurring:

I write to emphasize that the Voting Rights Act, as amended, does not assure that candidates, by reason of race or color, should be elected in proportion to their percentage of the voting population at any given time. 42 U.S.C. § 1975(b) establishes no "right to have members of a protected class [be] elected in numbers equal to their proportion in the population." The effect of our decision is to remand this case for the opportunity of the parties to develop evidence, including the results of the judicial election which plaintiffs unsuccessfully sought to enjoin.

The facts in *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012, *reh'g denied*, 459 U.S. 899, 103 S.Ct. 198, 74 L.Ed.2d 160 (1982), cited as a basis for plaintiffs having asserted a sufficient claim for constitutional relief differ markedly from the circumstances in this case. Decided after the Voting Rights Act was amended in 1982, *Rogers* discussed the historic racial deprivation of voting rights in a predominantly black rural Georgia county in deciding that constitutional relief was indicated for local at large offices in which no black had ever served. This complaint sets out a thin constitutional cause of action at best in comparison to *Rogers*. The study relied upon in this case by plaintiffs, a 1986 report of Lois M. Pelekondas, refers to four elections only, head-to-head, between white and black candidates in Hamilton County, Ohio, which was about 19% black in 1980, and 15.7% black in 1970. This report refers to a losing effort of a black judicial candidate in 1976, William McClain, who received 47.2% of the total votes cast in his race against Robert Gorman, a white democrat. This would indicate that had McClain received *all* the black votes cast, he would still have received more than one-third of the white votes cast in that election, assuming that the vote was roughly proportional to the makeup of the electorate.[1] This hardly comports with a bloc voting pattern prereq-

---

**1.** The Pelekondas report, in fact, shows that McClain received more than 40% of the votes in many of the more overwhelmingly white wards.

uisite in such cases. There is no allegation or evidence that a minority group was denied an equal opportunity to participate in the Hamilton County elections, which was determinative in *Whitcomb v. Chavis*, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973).

There is no allegation that the at large voting method was adopted by Hamilton County as a change from a prior district voting pattern, only that the City of Cincinnati judgeships merged with those of the County beginning in 1965. Yet Professor Pelekondas in her report indicated that the percentage of voters outside the City of Cincinnati in Hamilton County was less than 42% in 1960, the year of the last federal census taken before this change took place. This would scarcely indicate an intent on the part of Hamilton County officials to dominate or subjugate the minority population in Cincinnati by continuation of an at large judicial voting plan.

Only by giving plaintiffs the benefit of a very considerable doubt can it be said that they have set out a constitutional claim in this case. They point to only four judicial elections since 1965 in which a black candidate faced a white candidate in a general election, and in two of those elections the black candidate received approximately 47% of the total vote. I doubt that these uncontested facts set out any basis for a fourteenth or fifteenth amendment claim.

I concur in the reasoning of Judge Lively's opinion as it relates to the Voting Rights Act claim, and that our decision in *Gilday v. Board of Education*, 472 F.2d 214 (6th Cir.1972), does not control the constitutional claim.