**SOUTHERN CHRISTIAN LEADERSHIP CONFERENCE OF ALABAMA, et al., Plaintiffs,**

v.

**Don SIEGELMAN, et al., Defendants.**

**Civ. A. No. 88–D–0462–N.**

United States District Court,
M.D. Alabama, N.D.

June 7, 1989.

J. Richard Cohen and Elizabeth Johnson, Montgomery, Ala., for plaintiffs.

Fournier J. Gale, III, Maynard, Cooper, Frierson & Gale, Birmingham, Ala., David R. Boyd, Balch & Bingham, Don Siegelman, Atty. Gen., and Susan E. Russ, Asst. Atty. Gen., Montgomery, Ala., for State of Ala., Siegelman, Torbert, Browder, Hobbie, Florence and Reynolds.

James C. Wood, Simon, Wood & Crane, Mobile, Ala., for L.W. Noonan.

## MEMORANDUM OPINION

DUBINA, District Judge.

There are two motions presently pending in this cause: the defendants' motion for partial summary judgment, filed herein on November 7, 1988, on the ground that section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973 ("section 2"), does not apply to judicial elections; and the defendants' motion for partial reconsideration of this court's order granting dismissal without prejudice of certain of the plaintiffs' claims, also filed on November 7, 1988. On November 14, 1988, defendant L.W. Noonan, Probate Judge of Mobile County, Alabama, filed a separate motion for partial summary judgment and a supporting memorandum of law. In support of and in opposition to the pending motions, the parties have submitted detailed memorandum briefs and other documentary evidence. Additionally, on January 12, 1989, the parties presented oral arguments in support of their respective positions.

## I. INTRODUCTION

On May 11, 1988, the plaintiffs filed the instant action, asking this court to enjoin violations of section 2 of the Voting Rights Act, the fourteenth and fifteenth amendments to the United States Constitution, and 42 U.S.C. § 1983. The plaintiffs allege that these provisions are violated by the

State of Alabama's use of numbered place, at-large elections for state circuit and district judges. They seek, *inter alia,* declaratory and injunctive relief to prevent the defendants from maintaining the current system of elections, which they allege impermissibly dilutes the right of blacks to vote and prevents them from electing candidates of their choice.

On October 28, 1988, the plaintiffs filed a first amended complaint in this cause in which they allege, *inter alia,* that the boundary lines established by the Alabama Legislature for the judicial circuits have been drawn in a way that fragments concentrations of the state's black population, dilutes black voting strength, and results in a denial or abridgement of the rights of the plaintiffs to vote. The plaintiffs base this claim on section 2, the fourteenth and fifteenth amendments to the United States Constitution, and 42 U.S.C. § 1983. In addition to the relief sought in the original complaint, the plaintiffs seek, *inter alia,* permanent injunctive relief enjoining the defendants from utilizing the present judicial circuit districting scheme and a court order requiring them to redistrict the circuits to provide all Alabama citizens with equal access to the political process.

On October 27, 1988, pursuant to Rule 41(a)(2), *Fed.R.Civ.P.,* the plaintiffs filed a motion to dismiss without prejudice their claims challenging the numbered place, at-large election system for certain circuits and districts, as described in their attached appendix. On October 28, 1988, the court granted the plaintiffs' motion to dismiss without prejudice. Further, on January 9, 1989, the court entered an order, pursuant to Rule 23, *Fed.R.Civ.P.,* granting the plaintiffs' motion for certification of a plaintiff class and subclasses and designating certain individuals to serve as class representatives in this cause.

## II. FACTS

The State of Alabama currently has thirty-nine (39) judicial circuits and sixty-seven (67) judicial districts. All judges in these circuits and districts are elected at-large. When more than one judge serves in any given circuit or district, judicial candidates qualify to run for numbered places. *See* Ala. Const. amend. 328, § 6.13; *Ala.Code* §§ 12-17-21, 12-17-62 (1975).

At least as early as 1819, Alabama established judicial circuits and provided that each circuit would have a single judge. *See* Ala. Const. art. V, § 5 (1819). Early in this century, the state began to add additional judges in some circuits. *See, e.g.,* Ala. Act. No. 712 (September 25, 1915); *Ala.Code* § 12-17-20 (1975). The district court system was structured similarly when it was created by the Judicial Article in 1973 and fleshed out by the Judicial Article Implementation Act two years later. *See* Ala. Const. amend. 328, § 6.05; *Ala. Code* § 12-17-61 (1975).

Of Alabama's thirty-nine (39) judicial circuits and sixty-seven (67) judicial districts, eight (8) circuits and fifty-two (52) districts elect only one judge. The plaintiffs' challenge to Alabama's election scheme does not extend to these latter circuits and districts.[1] Of the remaining thirty-one (31) circuits and fifteen (15) districts, twenty-one (21) circuits and eleven (11) districts have been dismissed without prejudice, pursuant to this court's October 28, 1988, order granting the plaintiffs' motion to dismiss those circuits and districts.[2] Accord-

---

1. At oral argument, the plaintiffs represented to the court that they do not assert any claims against circuits and districts which have only a single judge. A review by the court of all pleadings on file in this cause demonstrates that such challenge by the plaintiffs has indeed never been made. It is therefore unnecessary for the court to address the defendants' argument that these circuits and districts should not be a part of this lawsuit.

2. Those twenty-one (21) circuits and eleven (11) districts include all fifteen (15) circuits and seven (7) districts where the defendants argue that it is not feasible to draw a single-member district plan with a black population majority, based on 1980 census data and assuming that the districts would be of roughly equal size. It is therefore unnecessary at this time for the court to address the defendants' argument that these circuits and districts should not be a part of this lawsuit. The defendants' separate argument, that these circuits and districts should be dismissed with prejudice, instead of without, is addressed later in this memorandum opinion.

ingly, at the present time there are ten (10) circuits[3] and four (4) districts[4] remaining in this lawsuit.

## III. THE STANDARD FOR GRANTING SUMMARY JUDGMENT

Rule 56(c), *Fed.R.Civ.P.*, provides that summary judgment may be granted only:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Accordingly, when considering a motion for summary judgment, the court must refrain from deciding any material factual issues. Instead, the court's sole function on a motion for summary judgment is to determine whether there exist issues of material fact to be tried and, if not, whether the moving party is entitled to a judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987); *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986); *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir.1980). Moreover, in performing this function, inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. In other words, all doubt as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Tippens v. Celotex*, 805 F.2d 949: *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352 (11th Cir.1986).

As to the burden of proof on a motion for summary judgment, it is clear that the movant bears the exacting responsibility of showing both that there is no actual dispute as to any material fact and that he is entitled to a judgment as a matter of law. *See Combs v. King*, 764 F.2d 818 (11th

Cir.1985). In clarifying the proper allocation of this burden, the United States Supreme Court has stated as follows:

[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. . . . [We do not] suggest that the trial court should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255, 106 S.Ct. 2505, 2512, 2513, 91 L.Ed.2d 202 (1986) (citations omitted). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## IV. DISCUSSION

A. *Section 2 and its Application to Judicial Elections.*

Section 2 of the Voting Rights Act, as amended, absolutely prohibits racial discrimination in voting. It provides as follows:

(a) No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color. . . .

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of

---

3. The Fourth, Fifth, Sixth, Seventh, Tenth, Thirteenth, Fifteenth, Twentieth, Twenty-third, and Twenty-sixth Circuits.

4. The Districts of Jefferson, Mobile, Montgomery, and Russell Counties.

514

their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

Before this court can address the ultimate issue of whether Alabama's system for electing circuit and district judges dilutes minority voting strength under the "results" test of section 2,[5] it must first conclude that the amended section 2 in fact applies to judicial elections, and specifically to judicial elections as they have evolved in the State of Alabama. As far as this court is able to determine, this issue is one of first impression in the Eleventh Circuit.

The United States Court of Appeals for the Sixth Circuit, in *Mallory v. Eyrich,* 839 F.2d 275 (6th Cir.1988), and the United States Court of Appeals for the Fifth Circuit, in *Chisom v. Edwards,* 839 F.2d 1056 (5th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 390, 102 L.Ed.2d 379, are the only circuits in the country to have ruled on the issue of whether section 2 of the Voting Rights Act applies to state judicial elections. Each of those circuits answered the question in the affirmative. In addition, every trial court thus far to have the final word on this question has found the scope of section 2 to encompass state judicial elections. *See Clark v. Edwards,* No. 86–435–A, slip op. at 20 (M.D.La. Aug. 15, 1988), *injunction vacated on other grounds sub nom. Clark v. Roemer,* No. 88–3626 (5th Cir. Sept. 7, 1988); *Williams v. State Bd. of Elections,* 696 F.Supp. 1563, 1565 (N.D.Ill.1988); *Martin v. Allain,* 658 F.Supp. 1183, 1200 (S.D.Miss.1987).

Further, several lower courts have held that judicial elections are covered by section 5 of the Voting Rights Act,[6] *see Kirksey v. Allain,* 635 F.Supp. 347 (S.D.Miss. 1986) (three-judge court); *Haith v. Martin,* 618 F.Supp. 410, 412–13 (E.D.N.C.1985) (three-judge court), *aff'd,* 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986), and the fourteenth and fifteenth amendments to the United States Constitution. *See Voter Information Project v. City of Baton Rouge,* 612 F.2d 208 (5th Cir.1980).

Since *Chisom* and *Mallory* are decisions rendered by appellate courts outside this circuit, technically this court is not bound to follow them as binding precedent. However, this court agrees with the reasoning and holdings of the Fifth and Sixth Circuits and concludes that section 2 applies to state judicial elections.

In determining that it was the intent of Congress in amending the Voting Rights Act to broaden rather than restrict the Act, the courts in *Mallory* and *Chisom* discussed in detail the legislative history of the Voting Rights Act. As the court in *Mallory* noted, the Supreme Court, in upholding the constitutionality of the Voting Rights Act, described the purpose of the Act in broad terms: "The Voting Rights Act was designed by Congress to banish the blight of racial discrimination in voting,

5. Between 1965 and 1980, the United States Supreme Court and the United States Court of Appeals for the Fifth Circuit developed standards for assessing vote dilution claims that focused on the racially discriminatory impact of the particular election system at issue (the "results" test). *See, e.g., White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (*en banc*), *aff'd on other grounds sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975).

   In *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), a plurality of the Supreme Court abandoned the results test and held that discriminatory intent was the touchstone of a fourteenth amendment vote dilution case. In response to the harshness of *Bolden,* Congress amended section 2 of the Voting Rights Act in 1982 to reinstate the results test and "make clear that proof of discriminatory intent is not required to establish a violation of section 2." S.Rep. No. 417, 97th Cong., 2d Sess. at 2, *reprinted in* 1982 U.S.Code Cong. & Admin.News 177, 179 (1981).

6. Section 5 involves the mechanics of voting, while section 2 involves the fundamental right to vote for elected officials. Considered virtually companion sections, they operate in tandem to prohibit discriminatory practices in voting and contain almost identical language as to their respective scopes. *Chisom,* 839 F.2d at 1064.

which has infected the electoral process in parts of our country for nearly a century." *South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966).[7] Further, in *Allen v. State Bd. of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), the Supreme Court relied on the Act's legislative history to support an expansive interpretation of the sweep of the Act. As Chief Justice Warren stated:

> The legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered state in even a minor way. For example, § 2 of the Act, as originally drafted, included a prohibition against any [discriminatory] "qualification or procedure." During the Senate hearings on the bill, Senator Fong expressed concern that the word "procedure" was not broad enough to cover various practices that might effectively be employed to deny citizens their right to vote. In response, the Attorney General said he had no objection to expanding the language of the section, as the word "procedure" "was intended to be all-inclusive of any kind of practice." Indicative of an intention to give the Act the broadest possible scope, Congress expanded the language in the final version of § 2 to include any "voting qualifications or prerequisite to voting, or standard, practice, or procedure." 42 U.S.C. § 1973 (1964 ed., Supp. I).

*Id.* at 566–67, 89 S.Ct. at 832 (footnote omitted).

Accordingly, as the Sixth Circuit concluded, "There is no hint in either [*Katzenbach* or *Allen* ] that any state or local election, *whatever the office involved*, is exempted from coverage of the 1965 Act." *Mallory*, 839 F.2d at 278 (emphasis added).

Additional evidence of the Supreme Court's inclination to view the parameters of section 2 as being very broad is contained in *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), where the Court stated:

> Subsection 2(a) prohibits all States and political subdivisions from imposing *any* voting qualifications or prerequisites to voting, or any standards, practices, or procedures which result in the denial or abridgment of the right to vote of any citizen who is a member of a protected class of racial and language minorities. . . .

*Id.* at 43, 106 S.Ct. at 2762 (emphasis in original).

Congress' broad aspirations for the Voting Rights Act are further illustrated by the language of section 14(c)(1), which defines "voting" for purposes of the Act as follows:

> The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to the subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast *with respect to candidates for public or party office* and propositions for which votes are received in an election.

42 U.S.C. § 1973l(c)(1) (emphasis added). Clearly, aspirants for elective judicial positions are "candidates for public or party office." As the Fifth Circuit concluded in *Chisom*, "[T]herefore, section 2, by its express terms, extends to judicial elections. This truly is the only construction consistent with the plain language of the Act." 839 F.2d at 1060. *See also Mallory*, 839 F.2d at 278.[8]

---

**7.** Section 2, as amended, was intended "to ensure full protection" of the rights guaranteed by the fourteenth and fifteenth amendments. Sen. Rep. No. 417, *supra* note 5, at 27. The fifteenth amendment does not limit its coverage to certain categories of voting; rather, it simply protects "[t]he rights of citizens of the United States to *vote.*" U.S. Const. amend. XV, § 1 (emphasis added).

**8.** This court is also persuaded by the fact that, since its inception, Attorneys General of the United States have consistently supported an expansive, not restrictive, construction of the Voting Rights Act. Testifying at congressional hearings prior to the passage of the Act in 1965, the Attorney General stated that "every election in which registered voters are permitted to vote would be covered" by the Act. *Voting Rights:*

After reviewing the comprehensive legislative history of the 1982 amendment contained in S.Rep. No. 417, *supra* note 5, this court agrees. Nowhere in the 239 pages of the Report is there any indication whatsoever that Congress intended the Voting Rights Act to apply to only particular types of elections. Rather, the entire Report indicates to this court that the 1982 amendment was intended to effect an expansive application of the Act to state and local elections. As the Report states:

> Section 2 remains the major statutory prohibition of all voting rights discrimination. It also prohibits practices which, while episodic and not involving permanent structural barriers, result in the denial of equal access *to any phase of the electoral process* for minority group members.

*Id.* at 30, U.S.Code Cong. & Admin.News 1982, p. 207 (emphasis added).[9]

In light of Congress' clear intent in 1982 to liberalize and expand the Voting Rights Act—"to give the Act the broadest possible scope," *Allen*, 393 U.S. at 567, 89 S.Ct. at 832—this court finds that section 2 applies to judicial elections, and that its effect is to prohibit a state from using a scheme for electing judges that impairs the ability of black citizens to participate effectively in the political process.

The defendants' argument that section 2 does not apply is based on three grounds:

(1) judges are not "representatives;" (2) judges in Alabama hold "single-member offices;" and (3) the one-person, one-vote rule does not apply to judicial elections.

(1) *Judges are "representatives" within the meaning of section 2.*

■ The defendants argue that the term "representatives," as used in section 2(b), does not include judges.[10] They suggest that the *Mallory* and *Chisom* courts, in holding that section 2 does apply to judges, incorrectly relied on the limited legislative history available on this point. The defendants note that the amendments were intended to codify the results test of *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), and other pre-*City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), cases. *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986); S.Rep. No. 417, *supra* note 5, at 205 ("subsection (b) embodies the test laid down by the Supreme Court in *White*"). Accordingly, they argue, those cases, rather than the legislative history of the amendment, should be relied on in ascertaining Congress' intent. Notwithstanding the fact that the Supreme Court has referred to the Senate Report as an "authoritative source" in discerning Congress' intent in amending section 2, *Thornburg*, 478 U.S. at 43, n. 7, 106 S.Ct. at 2763, n. 7),[11] this court is

---

*Hearings before Subcomm. No. 5 of the House Judiciary Comm.*, 89th Cong., 1st Sess. (1965), at 21. In the *Chisom* case, the Attorney General continued the trend of broadly interpreting the Act to further its remedial purpose by filing an *amicus curiae* brief in which he maintained that the "plain meaning of [the language of section 2] reaches all elections, including judicial elections" and that the pre-existing coverage of section 2 was not limited by the 1982 congressional amendments. *Chisom*, 839 F.2d at 1064.

**9.** Further expansive statements are contained throughout the Report. For example, it states that section 2, as amended, "prohibits any voting practice, or procedure result[ing] in discrimination," *id.* at 2, U.S.Code Cong. & Admin.News 1982, p. 179, ensures that "the political processes are equally open to minority voters," *id.*, and prevents "denial of equal access to the electoral process." *Id.* at 16, U.S.Code Cong. & Admin.News 1982, p. 193. It also states that, the Voting Rights Act, as originally drafted in

1965, "operated [as] a general prohibition of discriminatory practices nationwide." *Id.* at 6, U.S.Code Cong. & Admin.News 1982, p. 183.

Finally, Senator Orrin Hatch, in his argument against the amending of section 2, noted the expansive parameters of section 2:

> It is important to emphasize at the outset that for purposes of section 2, the term "political subdivision" encompasses *all* governmental units, including city and county councils, school boards, *judicial districts*, [and] utility districts, as well as state legislatures.

*Id.* at 151, U.S.Code Cong. & Admin.News 1982, pp. 323–324 (former emphasis in original, latter emphasis added).

**10.** The defendants elaborate on this contention at pp. 6–7 of their *amicus* brief in the *Chisom* petition for certiorari.

**11.** The Senate Report itself states as follows: [The Committee on the Judiciary] has given the legislation detailed attention before com-

willing to weigh *all* available indicia of Congress' intent, be it case law or congressional records. However, the court disagrees with the defendants' reasoning that simply because *White* and the other key pre–1980 cases on minority vote dilution[12] did not specifically discuss judicial elections,[13] Congress did not intend for section 2, as amended, to apply to judges. It is true, as the defendants note, that "the courts' concept of vote dilution evolved entirely in a legislative setting." However, the case law in this area developed in such a limited way simply because the federal courts were constrained to address only the issues before them, and, until recently, no court had been asked to consider the Voting Rights Act in a judicial context. Congress is of course not so constrained. While the test which Congress codified in amending section 2 may have first been expressed in a legislative context, that is certainly not to say that Congress did not, or could not, make the test applicable to the elected members of every branch of government.

This court can find no evidence, implied or otherwise, that Congress intended for the term "representatives" to be narrowly construed so as to exclude members of the judiciary. This conclusion is further bolstered by the fact that the term is used only once in section 2, in a portion added by amendment in 1982, and that amendment was intended to broaden, not constrict, the scope of the Act.[14] It hardly seems plausible that, in expanding the Act, Congress would insert the term "representatives" for the first time, with no explanation or clarifying provision, if it intended the term to be used in its restrictive sense.[15]

This court agrees with the court in *Martin v. Allain* that, while "[j]udges do not 'represent' those who elect them in the same context as legislators represent their constituents, [t]he use of the word 'representatives' in Section 2 is not restricted to legislative representatives but denotes any-

---

ing to the conclusions reflected in this Report, which is the statement of the record of the intended meaning and operation of this bill. S.Rep. No. 417, *supra* note 5, at 1, U.S.Code Cong. & Admin.News 1982, p. 178.

**12.** *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971), and *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Bd. v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1975).

**13.** *White* involved a challenge to legislative reapportionment in the Texas House of Representatives. *Whitcomb* challenged Indiana's scheme of state legislative apportionment into multi-member districts. *Zimmer* was a suit for reapportionment of the school board and police juries in a rural Louisiana parish.

**14.** *See* Sen.Rep. No. 417, *supra* note 5, at 15–31.

**15.** While the Supreme Court has never specifically addressed the definition of "representatives" as used in the Act, it appears to have read the term in a broad, all-encompassing sense.

In summarizing subsection 2(b) in *Thornburg v. Gingles,* for example, the Court did not even use the word "representatives." Rather, it portrayed the primary limitation on the Act's applicability as being the requirement that plaintiffs be members of a protected class. As the Court stated:

Subsection 2(b) establishes that § 2 has been violated where the "totality of circumstances"

reveal that "the political processes leading to nomination or election ... are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."

478 U.S. at 43, 106 S.Ct. at 2763.

In other voting rights cases, the Supreme Court has used the term "representatives" in an expansive sense also, equating it, for example, with all people elected to perform governmental functions. In *Board of Estimate v. Morris,* the Court, citing a number of cases, stated:

[W]henever a state or local government decides to select persons by popular election *to perform governmental functions,* the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election....

—— U.S. ——, 109 S.Ct. 1433, 1437, 103 L.Ed.2d 717 (1989) (emphasis added) (citations omitted). The Court continued:

These cases are based on the propositions that in this country the people govern themselves through their *elected representatives....*

*Id.* 109 S.Ct. at 1438 (emphasis added). Although *Morris* did not, of course, specifically address the issue of judicial elections, the case nevertheless illustrates how broadly the Court has been inclined to construe the term "representatives" when using it in the context of voting rights.

one selected or chosen by popular election from among a field of candidates to fill an office, including judges." 658 F.Supp. 1183, 1200 (S.D.Miss.1987).

(2) *Not all Alabama judges hold "single-member offices."*

■ The defendants argue that section 2 does not apply to the Alabama judiciary because state circuit and district judges hold "single-member offices."

Only two federal courts have addressed the theory that the concept of vote dilution does not apply to these so-called single-member offices. *See Dillard v. Crenshaw County,* 831 F.2d 246, 251 (11th Cir.1987); *Butts v. City of New York,* 779 F.2d 141, 149 (2nd Cir.1985). Although neither court expressly defined the term "single-member office," it is clear to this court that the phrase, as used in those cases, refers to a situation where under no circumstances will there ever be more than one such position in a particular geographic voting area.[16]

The defendants refer to this definition, but then attempt to use it as a mere starting point as they extrapolate a fundamentally different meaning from it. They submit that "the hallmark of a single-member office, as [the *Butts* and *Dillard*] courts use the term, is not the fact that the office is traditionally held by only one individual[17] but, more importantly, the fact that the full authority of that office is exercised

exclusively by one individual."[18] The defendants offer no rationale for their alternative definition, however, and present no logical reason why the concept of vote dilution should not apply to offices whose power is exercised by one individual alone.

The defendants' confusion as to the true implications of the concept of single-member offices possibly arises from the fact that, in most cases, any officeholder who wields his authority independently will *coincidentally* also be the only holder of his position in the entire geographic area.[19] For example, it is unheard of to have more than one governor for the same state, or more than one mayor for the same city; *coincidentally,* these are also positions where the full authority of the office is exercised exclusively by one individual. Examination of *Butts, Dillard,* and the instant case demonstrates that these two characteristics do not always co-exist, and that when they do, they do so only by coincidence. Accordingly, this court is of the opinion that the defendants are incorrect when they extrapolate the latter characteristic from the former as a prerequisite for section 2 applicability.

*Butts v. City of New York* examined a statute requiring run-off elections in party primaries for mayor, city council president, and city comptroller whenever no candidate received more than 40 percent of the vote. The appellate court, in reversing the dis-

---

**16.** For example, there will never be more than one governor per state, nor more than one mayor or per city. In *Butts,* there was only one mayor, one city comptroller, and one city council president for the entire city.

**17.** While the court finds the phrase "the office is traditionally held by only one individual" somewhat vague, it reads it to say that there is only one individual holding office in the geographic area, *i.e.,* that there is only one such office in the particular jurisdiction.

**18.** In other words, the officeholder is not constrained to act only as one member of a multi-member body, such as a legislature.

**19.** The defendants state that:

[M]ayors or sheriffs hold single-person offices in Alabama ..., not because there is only one individual holding the office of mayor or

sheriff in the state—on the contrary, there are many—but because each mayor or sheriff exclusively exercises the full authority of his office to decide and to act, rather than sharing that authority equally with other members of a collegial body.

The defendants' reasoning is flawed, however. The *true* hallmark of a single-member office is that only one position is being filled for an entire geographic area, and the jurisdiction can therefore be divided no smaller. While mayors and sheriffs do indeed "hold single-person offices in Alabama," they do so because there is only one such position for the entire geographic area in which they run for election. It is irrelevant how many such positions there are in Alabama or, indeed, in the United States; what is important is how many positions there are in the voting jurisdiction. It is irrelevant, in ascertaining the potential existence of vote-dilution, that these officials happen to exercise the full authority of their offices alone.

trict court's ruling that the statute violated section 2, held that section 2 did not apply to the type of election in question. The court stated:

> There can be no equal opportunity for representation within an office filled by one person. Whereas, in an election to a multi-member body, a minority class has an opportunity to secure a share of representation equal to that of other classes by electing its members from districts in which it is dominant, there is no such thing as a "share" of a single-member office.[20]

779 F.2d at 148.[21] In stating that "there is *no such thing* as a "share" of a single-member office," the court in *Butts* relied

on the fact that there *cannot* be vote dilution where "districts in which [the minority] is dominant" are physically impossible to create.[22] In other words, where there is only one position at stake, it is impossible that a minority's voting power has been diluted by the implementation of at-large elections, just as it is impossible to split up the area into districts in order to enhance a minority's voting power.[23]

In effect, the at-large boundaries coincide with the only "district" boundaries possible; because there is only one position to be filled, it becomes impossible to split up the jurisdiction any smaller.[24] The concept of vote dilution is effectively rendered meaningless and such offices are inappropriate for section 2 vote dilution chal-

---

**20.** This assumes, of course, that the boundaries in place are a given. For example, if a city has one mayor, and a minority of black voters, it is impossible to create a district with a black majority—assuming the city's boundaries are a given. If those boundaries are challenged, however, the situation changes. By redrawing the city's external boundaries, it would in some cases be theoretically possible to create a black-majority voting jurisdiction. *Butts* apparently considered only those cases where a voting jurisdiction's outside boundaries are not challenged.

**21.** Because *Butts* was the first decision to discuss the concept of single-member offices in the context of vote dilution, this court has attempted to trace the decision's roots. *Butts'* discussion of precedent is limited, however, to the following statement:

> The distinction [between elections for multi-member bodies and those for single-member offices] is implicit in *City of Port Arthur v. United States*, 459 U.S. 159 [103 S.Ct. 530, 74 L.Ed.2d 334] (1982), where the Court struck down a run-off requirement that Port Arthur had appended to its at-large voting system for seats on the multi-member city council, but made no mention of a similar run-off requirement for the election of mayor. The latter run-off was not even challenged [by the Attorney General].

779 F.2d at 148.

Unfortunately, *Port Arthur* does not help this court in interpreting *Butts*. The aspect of *Port Arthur* which the court in *Butts* singled out was that the concept of vote dilution was not applied to the position of mayor by either the Attorney General or the courts involved. However, the *Port Arthur* decision does not address *why* this was the case; there is no discussion about which of the attributes of the office of mayor exempted it from a vote dilution challenge. Accordingly, as there is no language in the *Port*

*Arthur* decision either supporting or contradicting the defendants' interpretation of *Butts*, this court has relied on the text of *Butts* itself, in conjunction with the text of *Dillard* and a reasoned analysis of the concept of vote dilution, to analyze the validity of the defendants' argument.

**22.** The instant case differs somewhat from *Butts* in that in *Butts* the alleged vote dilution occurred as a result of run-off elections, while here the alleged vote dilution occurs as a result of at-large elections. In fact, vote dilution *could* occur as to such "single-member offices" by means of run-off elections. Without expressly saying so, the court evidently addresses only the possibility of vote dilution by means of at-large elections.

**23.** In contrast, where there is more than one of a particular position in a certain area, splitting up that area into districts *could* give a minority class "an opportunity to secure a share of representation equal to that of other classes by electing its members from districts in which it is dominant." *Butts*, 779 F.2d at 148.

**24.** Contrast this with the instant case. In Alabama today, while each elected trial judge asserts his authority independently and not in concert with other judges, it is possible for there to be more than one district or circuit judge position in a particular jurisdiction. (In fact, this is the very essence of at-large voting schemes and it is precisely such a situation which the plaintiffs in this lawsuit wish to prevent.) In such a case, unlike in *Butts*, more than one position is at stake and, accordingly, splitting the jurisdiction into two or more districts is not only possible, but can "secure [to a minority class] a share of representation equal to that of other classes." *Butts*, 779 F.2d at 148.

lenges.[25] There is no such rationale, however, for not applying section 2 to elected positions merely because "the full authority of that office is exercised exclusively by one individual," as the defendants would have this court do.

The defendants' argument is further undermined by the fact that one of the three positions at issue in *Butts,* that of city council president, was not an office whose full authority was exercised exclusively by one individual.[26] The very case on which the defendants base their argument, then, contradicts the theory they would have this court adopt.

*Dillard v. Crenshaw County,* the second case to consider the concept of single-member offices in the context of vote dilution, involved a challenge to a plan providing for at-large, county-wide election of the chairperson of the Calhoun County Commission. The defendants therein asserted that the chairperson performed primarily administrative duties, and that "legislative positions are subject to Section 2, but administrative positions are not." 831 F.2d at 246. In essence, that is the same argument advanced by the defendants in the instant case—that certain elective positions, by virtue of their functions, are exempt from section 2 challenges. The United States Court of Appeals for the Eleventh Circuit summarily dismissed this argument. As Judge Johnson wrote for the court:

> Calhoun County argues this distinction without basing it in the language and meaning of Section 2. As it is, the distinction has no direct roots in the legislation.
>
> Nowhere in the language of Section 2 nor in the legislative history does Congress condition the applicability of Section 2 on the function performed by an elected official. The language is only and uncompromisingly premised on the fact of nomination or election. Thus, on the face of Section 2, it is irrelevant that

the chairperson performs only administrative and executive duties. It is only relevant that Calhoun County has expressed an interest in retaining the post as an electoral position. Once a position is opened to the electorate, and if it is shown that the context of that election creates a discriminatory but corrigible election practice, it must be open in a way that allows racial groups to participate equally.

*Id.* at 250–51. The defendants' argument in the instant case, that the applicability of section 2 should be based on the functions of a particular position, is in direct conflict with the holding of *Dillard.*

In conclusion, this court can find no basis for the defendants' position in either *Butts* or *Dillard.* Further, it can discern no rational reason why the concept of vote dilution cannot, or should not, apply to elected members of the judiciary simply because judges exercise their authority in solitude.

(3) *The one-person, one-vote principle is distinct from the concept of vote dilution.*

The defendants argue that because the one-person, one-vote principle does not apply to judicial elections, *Wells v. Edwards,* 347 F.Supp. 453 (M.D.La.1972), *aff'd* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973), concomitantly section 2 does not apply. However, as both the Fifth and Sixth Circuits have explicitly held, the concept of one-person, one-vote is distinct from that of vote dilution, and the applicability of one is not a prerequisite for the applicability of the other. *See Chisom v. Edwards,* 839 F.2d at 1060–61; *Mallory v. Eyrich,* 839 F.2d at 277–78. *See also Voter Information Project v. City of Baton Rouge,* 612 F.2d 208, 211 (5th Cir.1980) (citing *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)); *Martin v. Al-*

---

**25.** This concept explains, for example, the plaintiffs' failure to include in this lawsuit those circuits and districts with only one judge. *See supra* note 1 and accompanying text.

**26.** The city council president's power was primarily exercised as a member of the eight-member Board of Estimates, a multi-member body. New York City Charter, Chapter 2, § 23; Chapter 3, §§ 61, 62.

*lain,* 658 F.Supp. 1183, 1200 (S.D.Miss. 1987).

"The primary purpose of one-[person], one-vote apportionment is to make sure that each official member of an elected body speaks for approximately the same number of constituents." *Wells,* 347 F.Supp. at 455. The concept of one-person, one-vote addresses the ratio of citizens to their elected officials. It is a philosophy distinct from that of vote dilution, which addresses the relative weight of those citizens' votes, *after* the ratio of citizens to elected officials has been determined.[27] Furthermore, in contrast to the concept of one-person, one-vote, which is based on the Equal Protection Clause of the fourteenth amendment, the concept of vote dilution is additionally based on an act of Congress, section 2 of the Voting Rights Act.

In conclusion, this court agrees with the *Chisom* and *Mallory* courts that the applicability of the principle of one-person, one-vote is not a prerequisite for the applicability of section 2 of the Voting Rights Act.

While this court is persuaded that section 2 of the Voting Rights Act clearly applies to state judicial elections, it continues to have serious and deeply felt concerns about the difficulty in fashioning an equitable remedy through reapportionment under the Voting Rights Act, should it become necessary to do so in the instant case.

This court shares the reservations expressed by Judges Coleman, Clark, and Hill in their dissenting opinions in the case of *Kirksey v. Bd. of Supervisors,* 554 F.2d 139, 157–63 (5th Cir.1977) (en banc), and by Judge Hill in his specially concurring opinion in the more recent case of *United States v. Dallas County Comm'n,* 850 F.2d 1433, 1443–45 (11th Cir.1988). This court seriously questions the propriety and wisdom of utilizing the Voting Rights Act to restructure election schemes, including the judicial system challenged herein. It appears to the court that there is a real possibility that no fair, reasonable, and eq-

uitable remedy can ever be fashioned to redress whatever section 2 violations may exist in the instant case. Any remedy may only serve to further polarize the voting blocs which currently exist, and will almost certainly result in the removal from the bench of a number of decent, fair and competent state judges with many years of dedicated service. In remedying one injustice this court may, in effect, be creating others.

The fact remains, nevertheless, that Alabama has chosen to hold elections to fill its state judicial offices, and it must therefore abide by the Voting Rights Act in conducting its judicial elections, including section 2 of the Voting Rights Act. As the Eleventh Circuit has stated, "Once a post is open to the electorate . . ., it must be open in a way that allows racial groups to participate equally." *Dillard v. Crenshaw County,* 831 F.2d 246, 251 (11th Cir.1987).

This court concludes, as a matter of law, that section 2 applies to judicial elections. Accordingly, it is the opinion of this court that the defendants' motions for partial summary judgment are due to be denied.

**B.** *The Dismissal without Prejudice Issue.*

The second issue pending before the court is whether this court should reconsider its October 28, 1988, order granting the plaintiffs' motion of October 27, 1988, to dismiss "without prejudice" claims challenging the numbered place, at-large election system for twenty-one (21) circuits and eleven (11) districts. The defendants now ask this court to reconsider that order and dismiss those circuits and districts with prejudice or, alternatively, grant them summary judgment.

A dismissal should be granted without prejudice unless it would inflict clear legal prejudice to the defendants. *McCants v. Ford Motor Co.,* 781 F.2d 855, 856–57 (11th Cir.1986); *LeCompte v. Mr. Chip, Inc.,* 528 F.2d 601, 604 (5th Cir.1976). Although the

---

**27.** In the instant case, for example, the plaintiffs do not challenge the number of judges within the various circuits and districts, which would be a one-person, one-vote issue. Rather, they accept the number of judges as a given and challenge only the relative weight of different voting blocs in electing those judges.

defendants assert that dismissal without prejudice would "leave the door open to identical future challenges," the mere possibility of a second lawsuit is clearly insufficient proof of legal prejudice. *McCants,* 781 F.2d at 857; *LeCompte,* 528 F.2d at 604. The court also notes that the plaintiffs' motion to dismiss was made early in the case, before any dispositive motions were filed, and before significant discovery had been conducted.

Given that the plaintiffs sought the dismissal without prejudice early in the litigation, and that the defendants have made no showing of legal prejudice, the court declines to modify its order of October 28, 1988, dismissing certain claims without prejudice. Accordingly, it is the opinion of this court that the defendants' motion for reconsideration of the order granting dismissal without prejudice is due to be denied.

A separate order will be entered in accordance with this memorandum opinion.[28]

28. Because the section 2 question presented to this court in this case is one of first impression in this circuit, the court suggests to the defendants that they taken an immediate interlocutory appeal to the Eleventh Circuit. This court is of the opinion that this memorandum opinion with accompanying order involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the opinion and order may materially advance the ultimate termination of the litigation.