Tyrone **BROOKS**, et al., Plaintiffs,

v.

**STATE BOARD OF ELECTIONS,**
et al., Defendants.

**Civ. A. File No. CV288–146.**

United States District Court,
S.D. Georgia,
Brunswick Division.

Dec. 1, 1989.

---

Laughlin McDonald, Kathleen L. Wilde, Neil Bradley, American Civ. Liberties Union Foundation, Inc., Atlanta, Ga., and J. Gerald Hebert, Atty. Voting Section Civ. Rights Div., Dept. of Justice, Washington, D.C., for plaintiffs.

David F. Walbert, Atlanta, Ga., for defendants.

Edmund Booth, Asst. U.S. Atty., Augusta, Ga.

Before KRAVITCH, Circuit Judge, and EDENFIELD and BOWEN, District Judges.

### MEMORANDUM OPINION AND ORDER

On July 13, 1988 plaintiffs commenced this action alleging violations of sections 2 and 5 of the Voting Rights Act of 1965 (currently codified as amended at 42 U.S.C. §§ 1973 and 1973c, respectively), as well as provisions of the first, thirteenth, fourteenth, and fifteenth amendments to the United States Constitution. The plaintiffs are black voters of Georgia, some of whom are elected officials of various Georgia

counties, suing for themselves and on behalf of those similarly situated.[1]

Defendants do not contest class certification or standing.[2] The defendants are the Georgia State Board of Elections and Max Cleland, Secretary of State and Chairman of the Georgia State Board of Elections.[3] A three-judge district court was convened to consider the alleged violations of section 5 of the Voting Rights Act. *See* 42 U.S.C. § 1973c; 28 U.S.C. § 2284. Currently before the court is plaintiffs' motion for summary judgment and injunctive relief.

## I.

Since August 7, 1965 Georgia has been a "covered jurisdiction" within the meaning of section 5 of the Voting Rights Act. 28 C.F.R. § 51 App. (1988); 30 Fed.Reg. 9897 (1965). As a covered jurisdiction, Georgia must administratively preclear "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964" with the Attorney General of the United States or institute a declaratory judgment action in the District Court for the District of Columbia. *See* 42 U.S.C. § 1973c.[4]

From 1964 to 1988, Georgia enacted 80 statutes regarding the election of superior court judges. All told, seventy-seven judgeships and five new circuits were created. The State submitted these to the Attorney General for preclearance on June 27 and 28, 1988. By letter of August 26, 1988 the Attorney General notified the State that he did not object to thirty-one of the proposed changes. Thus, twenty-nine

1. These plaintiffs include: Representatives from Fulton County to the Georgia General Assembly; residents and voters of Fulton County; residents and voters of Glynn County, Georgia; a resident and voter of Muscogee County, Georgia; a resident and voter of Mitchell County, Georgia; a resident, voter, and Representative to the Georgia General Assembly of Dougherty County, Georgia; a resident and voter of Bibb County, Georgia; a resident, voter, and elected official of Chatham County, Georgia; and a resident and voter of Wilkes County, Georgia. All plaintiffs are black.

2. Oral argument, Tr. at 5.

3. Other named defendants, having been found unnecessary to provide full relief, were dismissed pursuant to Fed.R.Civ.P. 21.

4. Section 1973c provides in relevant part:

§ 1973c. **Alteration of voting qualifications and procedures; action by state or political subdivision for declaratory judgment of no denial or abridgement of voting rights; three judge district court; appeal to Supreme Court**

Whenever a [covered] State or political subdivision [...] shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, [...] such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: Provided, That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made. Neither an affirmative indication by the Attorney General that no objection will be made, nor the Attorney General's failure to object, nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. In the event the Attorney General affirmatively indicates that no objection will be made within the sixty-day period following receipt of a submission, the Attorney General may reserve the right to reexamine the submission if additional information comes to his attention during the remainder of the sixty-day period which would otherwise require objection in accordance with this section. Any action under this section shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 and any appeal shall lie to the Supreme Court.

of the seventy-seven new judgeships and three of the five new circuits were precleared. *See* Appendix A. In the same letter the Attorney General requested more information regarding the remaining changes.[5] The State submitted some further information, but chose not to comply fully with the Attorney General's request.

■ In order to obtain preclearance under section 5 of the Voting Rights Act, the State, as the submitting authority, has the burden of showing that a submitted change has neither a discriminatory purpose nor effect. *See e.g., Georgia v. United States,* 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973). Because the State deliberately chose not to comply with the Attorney General's request for further information regarding the changes, the State failed to meet its burden under section 5. Accordingly, on June 16, 1989 the Attorney General notified the State that he objected to the addition of the forty-eight judgeships and the redistricting of two circuits with respect to which he had earlier requested information. *See* Appendix B.

The statutes to which the Attorney General has objected fall into three broad categories. First, two new judicial circuits are created. Second, some circuits that previously had only one superior court judgeship are given one or more additional judgeships. Third, certain circuits that had previously had more than one superior court judgeship are given one or more additional judgeships.

In 1989 the State General Assembly created six more superior court judgeships. All but one of these was to commence on July 1, 1989. *See* Appendix C. The governor has agreed to refrain from nominating anyone to fill these posts pending this court's decision. The remaining judgeship is authorized to commence on January 1, 1990. The State has not yet submitted these changes to the Attorney General for

preclearance, nor has the State commenced a declaratory judgement action in the District Court for the District of Columbia as provided by section 5 of the Voting Rights Act.

One of the judgeships created in 1989 has, however, been precleared: the officials of Bartow County submitted the addition of a judgeship to the Cherokee Circuit to the Attorney General for preclearance, and the Attorney General has notified Bartow County that he does not object to the change.

Among other requirements for election, a candidate for a superior court judgeship must designate the specific opening for which he is seeking election if there is more than one judgeship up for election. In order to be elected, a candidate must receive an absolute majority of votes cast. Judges are elected on a circuit-wide basis. As we discuss below, for the purposes of our opinion we will treat these three requirements as having been precleared within the context of the then-existing electoral scheme. *See* infra Part III.A.2.

## II.

■ The role of the three-judge court entertaining an action under section 5 of the Voting Rights Act is limited. The three-judge court determines "(1) whether a change [is] covered by § 5, (ii) if the change [is] covered, whether § 5's approval requirements were satisfied, and (iii) if the requirements were not satisfied, what remedy [is] appropriate." *City of Lockhart v. United States,* 460 U.S. 125, 129 n. 3, 103 S.Ct. 998, 1001 n. 3, 74 L.Ed.2d 863 (1983). The court does not consider the merits of a plaintiff's claim that the proposed changes are discriminatory. *United States v. Board of Supervisors,* 429 U.S. 642, 97 S.Ct. 833, 51 L.Ed.2d 106 (1977); *Perkins v. Matthews,* 400 U.S. 379, 385, 91 S.Ct. 431, 435, 27 L.Ed.2d 476 (1971). The court may

---

**5.** The information requested by the Justice Department included: the legislative history of the statutes, alternatives considered, and newspaper accounts of the superior court system; criteria used in deciding when to create new circuits rather than adding judgeships to existing circuits; description of participation by the black community in the decision-making process; state reports or studies, from 1964 to date, relating to judicial reform, elections, additions, or redistricting; election returns since 1964 identified by race and incumbency, and also data relating to quantity and racial designation of registered voters.

consider any equitable arguments put forth by the defendants or the plaintiffs only in the limited context of fashioning an appropriate remedy. *See infra* Parts IV and V.

### III.

As noted above, the first step for a three-judge court is to determine "whether a change [is] covered by § 5." In this case, that question has two facets. First, whether, as a general matter, section 5 encompasses changes regarding the election of judges. If section 5 applies to the election of judges, then the next step is to determine whether the specific "changes" at issue in this case are "covered changes," i.e., changes that trigger the application of section 5.[6]

### A.

■ "For possible appeal purposes," the State has "expressly reserve[d] the contention that the election of judges are never covered by Section 5." Because defendants cannot cede jurisdiction to a federal court, and because three-judge district courts are exceptional, this court should consider its jurisdiction as a threshold issue. *Cf. Harper v. Levi*, 520 F.2d 53 (D.C.Cir.1975) (statute calling for three-judge district court should be strictly construed).

Courts that have addressed this question have concluded that section 5 applies to the election of judges. *See Haith v. Martin*, 618 F.Supp. 410 (E.D.N.C.1985) (three-judge court), *aff'd mem.*, 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986); *Kirksey v. Allain*, 635 F.Supp. 347 (S.D.Miss.1986) (same).[7]

The Supreme Court's summary affirmance of *Haith v. Martin* may well have decided this issue. In *Haith*, the state did not challenge that the changes were changes of a "standard, practice, or procedure with respect to voting," but the state did argue that section 5 did not apply to the election of judges. 618 F.Supp. at 414. The state also argued that equitable principles excused the state's failure to preclear because earlier the state had submitted the changes for preclearance and the Justice Department had informed the state that the changes at issue were not within the scope of section 5. *Id.*

The three-judge court concluded that section 5 encompassed the election of judges, and found that the proposed changes to the election of superior court judges had not been precleared as section 5 required. *Id.* at 412–13. The court also concluded that section 5 did not empower the court "to provide equitable relief to defendants, no matter how just their cause." *Id.* at 414.

The state appealed to the Supreme Court. The state's jurisdictional statement presented the following two questions to the Court:

I. Whether this Court's decision in *Allen v. State Board Elections*, 393 U.S. 544 [89 S.Ct. 817, 22 L.Ed.2d 1] (1969), should be extended to cover a state's judiciary?

II. Whether past changes in North Carolina's judiciary must be precleared pursuant to § 5 of the Voting Rights Act, in light of the special circumstances of this case?

The Supreme Court summarily affirmed the three-judge court. 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986).

The State cites *Fusari v. Steinberg*, 419 U.S. 379, 388–89, n. 15, 95 S.Ct. 533, 539–40, n. 15, 42 L.Ed.2d 521 (1975) for the proposition that a summary affirmance is of limited precedential significance. All *Fusari* teaches, however, is that lower courts may not construe a summary af-

---

6. Implicit in this is, of course, the recognition that some changes are not covered changes. For example, if a state merely codifies its election laws, this is a change, but it is not a *covered* change because it does not alter a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting." *E.g., Kirksey v. Allain*, 635 F.Supp. 347, 350 (S.D.Miss.1986) (three-judge court).

7. We also note that § 2 of the Voting Rights Act has been held to apply to the election of judges. *Mallory v. Eyrich*, 839 F.2d 275 (6th Cir.1988); *Chisom v. Edwards*, 839 F.2d 1056 (5th Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988); *Martin v. Mabus*, 700 F.Supp. 327 (S.D.Miss.1988).

firmance as having reached any issues other than those absolutely necessary to have resolved the case. As plaintiffs observe, summary affirmances "without doubt reject the specific challenge presented in the statement of jurisdiction" and "prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977).

For the *Haith* Court to have affirmed, it necessarily must have concluded that section 5 applies to the election of judges.[8]

Even in the absence of the Supreme Court's affirmance in *Haith*, the State has been unable to point to any language in the statute or in the legislative history in support of its contention that section 5 of the Voting Rights Act does not apply to the election of judges.

By its terms, section 5 of the Voting Rights Act does not differentiate among types of elections. Section 5 applies to "*any* voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." The Supreme Court has ruled that the broadest possible meaning should be given to the phrase "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964." *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969). As the *Allen* Court noted, "[t]he legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered state in even a minor way." *Id.* at 566, 89 S.Ct. at 832. *See also Dougherty County, Georgia, Board of Education v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *United States v. Sheffield Board of Commission-*

*ers*, 435 U.S. 110, 122–23, 98 S.Ct. 965, 974–75, 55 L.Ed.2d 148 (1978).

Although not dispositive on the issue of the intent of Congress in passing the 1965 Voting Rights Act, it is interesting to note that when Congress considered extending the Voting Rights Act in 1982, Congress apparently believed the Voting Rights Act applied to the election of judges. For example, Senator Hatch asserted that the Act's use of the term " 'political subdivision' encompasses all governmental units, including city and county councils, school boards, *judicial districts*, utility districts, as well as state legislatures." S.Rep. 417 at 151, 1982 U.S.Code Cong. & Admin.News 177, 323 (emphasis added). In addition, the statistical evidence presented to Congress in considering the need to extend the Voting Rights Act uniformly included election of minorities to judgeships (where appropriate).

Thus, in light of the Supreme Court's summary affirmance of *Haith*, and in light of the broad language of section 5, we conclude that section 5 applies to the election of judges.

### B.

Having concluded that the election of judges falls within the scope of section 5, our next task is to determine whether the specific changes at issue here trigger section 5 scrutiny, i.e., whether the statutes at issue here enact changes of "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting."

### 1. *The creation of new circuits.*

■ The defendants do not dispute that the creation of new judicial circuits falls under section 5; yet even while acknowledging this, the State thus far has refused to take the necessary steps to preclear the

---

**8.** The *Haith* court said that "Defendants have not challenged plaintiff's contentions that each of the statutes in question deals with a 'standard, practice, or procedure with respect to voting,' " 618 F.Supp. at 410. This does not mean that the defendants conceded that § 5 applies to the election of judges. Indeed, to the contrary,

one of the issues on appeal to the Supreme Court was squarely presented as whether § 5 applies to the election of judges. What the *Haith* court's observation means is that the defendants did not challenge whether the changes were specifically "covered changes."

redistricting changes. Indeed, the changing of geographical boundaries of election districts, either by redrawing or splitting pre-existing districts, however minor, is unquestionably a change that must be precleared under section 5. *See* 28 C.F.R. § 51.13(e) (Example of covered change includes "Any change in the constituency of an official or the boundaries of a voting unit (e.g., through redistricting, annexation, deannexation, incorporation, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections)"). *See also, e.g., McCain v. Lybrand*, 465 U.S. 236, 237, 104 S.Ct. 1037, 1039, 79 L.Ed.2d 271 (1984) (creation of residency districts within county falls under section 5); *Georgia v. United States*, 411 U.S. 526, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973) (redistricting); *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969)

(change from district to at large voting); *McMillan v. Escambia County*, 559 F.Supp. 720 (N.D.Fla.) (redistricting), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

The redistricting necessarily affects both the newly-created circuits and the prior circuits from which new circuits were created. Thus, the creation of the Houston Circuit from the former Macon Circuit, and the creation of the Alcovy Circuit from the Western and Stone Mountain Circuits implicates both the newly-created circuits and the current Macon, Western, and Stone Mountain circuits. Any judgeships that were added to any of these circuits after the redistricting are, therefore, also subject to preclearance. Specifically, the following acts all require preclearance under section 5:

| Year | Act | Change |
|------|-----|--------|
| 1969 | 303 (as amended 1971 Act 587) | created Houston Circuit |
| 1972 | 849 | created Alcovy Circuit |
| 1972 | 1194 | Stone Mountain add'l judge |
| 1976 | 996 | Western add'l judge |
| 1978 | 1082 | Alcovy add'l judge |
| 1981 | 772 | Macon add'l judge |
| 1984 | 851 | Houston add'l judge |
| 1986 | 1339 | Stone Mountain add'l judge |

*2. The Creation of New Judgeships*

■ In determining whether the addition of a new judgeship to an existing circuit is a covered change in a "standard, practice, or procedure with respect to voting," we recognize that "[t]he legislative history on the whole supports the view that Congress intended to reach any state enactment which altered the election law of a covered state in even a minor way." *Allen v. State Board of Elections*, 393 U.S. 544, 566, 89

S.Ct. 817, 832, 22 L.Ed.2d 1 (1969). *See also Dougherty County, Georgia, Board of Education v. White*, 439 U.S. 32, 99 S.Ct. 368, 58 L.Ed.2d 269 (1978); *United States v. Sheffield Board of Commissioners*, 435 U.S. 110, 112–23, 98 S.Ct. 965, 974–75, 55 L.Ed.2d 148 (1978).

The regulations under section 5, promulgated by the Attorney General, stress the broad scope of "standard, practice, or procedure":[9]

**9.** *See also* 28 C.F.R. § 51.13 (Examples of changes.)

Changes affecting voting include, but are not limited to, the following examples:
(a) Any change in qualifications or eligibility for voting.
(b) Any change concerning registration, balloting and the counting of votes and any

change concerning publicity for or assistance in registration or voting.
(c) Any change with respect to the use of a language other than English in any aspect of the electoral process.
(d) Any change in the boundaries of voting precincts or in the location of polling places.
(e) Any change in the constituency of an official or the boundaries of a voting unit

**28 C.F.R. § 51.12 Scope of requirement.**

Any change affecting voting, even though it appears to be minor or indirect, returns to a prior practice or procedure, ostensibly expands voting rights, or is designed to remove the elements that caused objection by the Attorney General to a prior submitted change, must meet the Section 5 preclearance requirement.

The Supreme Court has approved expressly of this expansive view of § 5: "Given the central role of the Attorney General in formulating and implementing § 5, this interpretation of its scope is entitled to particular deference."[10] *Dougherty County, Georgia, Board of Education v. White,* 439 U.S. at 39, 99 S.Ct. at 373. *See also United States v. Sheffield Board of Commissioners,* 435 U.S. 110, 98 S.Ct. 965, 55 L.Ed.2d 148 (1978) (giving deference to Attorney General's contemporaneous interpretation as guide to congressional intent).

In addition to its express approval of the Attorney General's broad view of section 5, the Supreme Court has set the following standard for whether a proposed change falls within § 5: "in determining if an enactment triggers § 5 scrutiny, the question is not whether the provision is in fact innocuous and likely to be approved, but whether it has a *potential* for discrimination."

*Dougherty County, Georgia, Board of Education v. White,* 439 U.S. at 42, 99 S.Ct. at 374 (emphasis in original).

Thus, to determine whether the addition of a judgeship to a preexisting circuit is a covered change we must consider whether that addition has a potential for discrimination, and must conduct our inquiry in light of the Supreme Court's admonition that "Congress intended to reach any state enactment which altered the election law of a covered state in even a minor way." We stress, however, that we may not consider the merits of whether or not a particular change has a discriminatory purpose or effect; rather, we may only consider whether it has a *potential* for discrimination.

The State argues that the addition of new judgeships does not constitute a covered change, and that it has no potential for discrimination, as the new judges will be elected according to Georgia's majority-vote, designated-post, and circuit-wide voting election procedures, all of which have already been precleared.[11] According to the State, the creation of additional judicial posts does not change any "standard, practice, or procedure with respect to voting" where the method by which candidates will

---

(e.g., through redistricting, annexation, deannexation, incorporation, reapportionment, changing to at-large elections from district elections, or changing to district elections from at-large elections).

(f) Any change in the method of determining the outcome of an election (e.g., by requiring a majority vote for election or the use of a designated post or place system).

(g) Any change affecting the eligibility of persons to become or remain candidates, to obtain a position on the ballot in primary or general elections, or to become or remain holders of elective offices.

(h) Any change in the eligibility and qualification procedures for independent candidates.

(i) Any change in the term of an elective office or an elected official or in the offices that are elective (e.g., by shortening the term of an office, changing from election to appointment or staggering the terms of offices).

(j) Any change affecting the necessity of or methods for offering issues and propositions for approval by referendum.

(k) Any change affecting the right or ability of persons to participate in political campaigns which is effected by a jurisdiction subject to the requirement of Section 5.

10. The Attorney General has filed an amicus brief in this case on behalf of plaintiffs, in which he expresses his belief that the addition of judgeships to pre-existing circuits is a "covered change" under section 5.

11. The State is correct in its assertion that the designated-post, majority-vote, and circuit-wide election procedures were precleared in the context of the then-existing electoral scheme. In *United States v. Georgia,* C.A. No. C76–1531A (N.D.Ga.1977) (three judge court), *aff'd mem.,* 436 U.S. 941, 98 S.Ct. 2840, 56 L.Ed.2d 782 (1978), the court concluded that the majority-vote and designated-seat election requirements had been precleared. In 1968 the Attorney General precleared the change (involving an amendment to the state constitution), whereby Georgia went from state-wide to circuit-wide election of judges. Finally, in 1983, the Attorney General precleared the change from partisan to non-partisan election of judges.

be elected to those posts has not been changed.

The State's argument, however, assumes that Georgia's election procedures were precleared with respect to the judgeships existing at the time of preclearance *and with respect to any future judgeships.* We cannot accept such an assumption. It is well established that the Attorney General does not preclear a change unless it is expressly and unambiguously presented to him for preclearance. *McCain v. Lybrand,* 465 U.S. 236, 253, 104 S.Ct. 1037, 1047–48, 79 L.Ed.2d 271 (1984). Preclearance occurs only in the context of an existing electoral scheme; the number of judges elected within a particular circuit constitutes part of that scheme. If adding new judicial posts, even where candidates will be elected according to precleared voting procedures, has "a potential for discrimination," then such an addition would be a covered "enactment" under section 5. *Dougherty County,* 439 U.S. at 42, 99 S.Ct. at 374.

Furthermore, the Attorney General could not have *objected* to the State's proposed election procedures based on the possibility that such procedures could have a discriminatory effect *if* additional judgeships were subsequently added. The Attorney General may only preclear that which is presented to him, and preclearance of the election procedures as applied to election of a cer-tain number of judges does not insulate those procedures from preclearance review when they are applied to a different number of judges and *may,* therefore, have a discriminatory effect.[12]

We think that, given Georgia's majority-vote, designated-post, and circuit-wide election rules, the creation of new judgeships does have the potential for discrimination. Where more than one judicial post exists in a given circuit, these election rules require a candidate to run for a specific seat. Georgia law thus precludes the alternative system where all candidates compete against each other and where judgeships are awarded to the highest vote-getters out of the field of candidates.

One effect of precluding the latter form of election is to prevent effective "single-shot" voting. In a "single-shot" voting campaign, a cohesive bloc of minority voters agrees to vote for only one candidate out of a group of candidates running for office, even though two or more officehold-ers will be elected out of the group of candidates running. For example, if two judges are to be elected out of a field of four candidates, the minority bloc of voters will vote for just one candidate. By focusing their voting power in this way, minority group can sometimes elect someone to office without a significant amount of support from the majority group voters.[13] Ma-

---

**12.** In *McCain v. Lybrand,* 465 U.S. 236, 253, 104 S.Ct. 1037, 1047–48, 79 L.Ed.2d 271 (1986), South Carolina had enacted a change in the county governance of Edgefield County. Under the 1966 act, "a three-member county Council with broad legislative and administrative pow-ers was created, and the county was divided into three residency districts for purposes of electing Council members." 465 U.S. at 239–40, 104 S.Ct. at 1040–41. This change was never sub-mitted to the Attorney General for preclearance. In 1971 the state changed the number of coun-cilmen from three to five, which necessitated the redistricting of the County into five residen-cy districts. This change was submitted to the Attorney General for preclearance, and the At-torney General did not object to the change. Subsequently, an action was brought under sec-tion 5 alleging that the 1966 change had never been submitted to the Attorney General for pre-clearance.

The Supreme Court reversed the three-judge court, and held that the preclearance of the 1971 change from three councilmen to five and the attendant redistricting did not have the ef-fect of preclearing the 1966 change that institut-ed the County Council. *McCain v. Lybrand,* 465 U.S. at 249–50, 104 S.Ct. at 1045–46.

Thus, under the rule of *McCain,* the Attorney General could not have precleared the addition of a judgeship to a circuit—if that is itself a covered change—when he precleared the major-ity-vote and designated-post requirements.

**13.** Assume a district with 40 minority-group vot-ers and 60 majority-group voters where there is racial bloc voting and two seats available. If anti-single-shot provisions are in place, so that head-to-head campaigns are required, the mi-nority group will never elect a candidate on its own without obtaining at least some majority-group votes.

However, where there are two seats available, the absence of anti-single-shot provisions may enable the minority group to elect a candidate. For example, under a scheme where voters may vote for any two from a field of four candidates, where minority voters can engage in single-shot

jority-vote, designated-post, and circuit-wide election rules are often called "anti-single-shot" provisions because they render such "single-shot" campaigns futile.

Anti-single-shot provisions cut off one avenue by which minority voters can exercise the vote within the electoral system. Changes which mitigate the ability of minority groups to elect their choice of candidates are potentially discriminatory. Adding judges to a circuit can bring about just such a change, because the anti-single-shot provisions can affect adversely the voting rights of minorities depending upon the number of judicial posts available.

The potential for discrimination resulting from the interplay of anti-single-shot provisions and a change in the number of posts is most evident in the change from a single-judge to a multi-judge circuit. Twenty-four of the challenged acts implement such a change. Where only one judge is to be elected in a circuit, anti-single-shot provisions can have no potential for discrimination. If another judicial post is added, however, such provisions may well be thwarting what would otherwise be an opportunity to conduct a successful single-shot voting campaign.[14]

Adding a post to a multi-judge circuit could have the same effect. Depending upon the percentage of minority voters and the cohesiveness of their voting, a successful single-shot voting campaign may be highly improbable until there are three or more available posts in the circuit.[15] If a single-shot campaign, although unavailing

when only two posts are available, would be successful in a three-post race, then the addition of that third post alters the effect of the anti-single-shot provisions in that district. As stated above, because anti-single-shot provisions affect minority bloc voting power, any potential change in the impact of such provisions creates the potential for discrimination. Thus, adding a judge or judges for either single-judge or multi-judge districts, has the potential for discrimination against the backdrop of anti-single-shot-election law provisions such as Georgia's.

Section 5 is a drastic remedy imposed on the States to remedy extraordinary wrongs. The State suggests that our ruling here will drastically expand the impact of Section 5. We disagree. The simple reality of Section 5 is that if a covered jurisdiction seeks to enact any change with respect to voting, however minor, that change must be precleared. If the Attorney General, or the District Court for the District of Columbia, refuses to preclear the change, then that change may not be enforced.

■ Contrary to the State's suggestion, our ruling here does not imply that if a State seeks to preclear any minor change, then the Attorney General may try to recast a state's entire electoral system. If a change is not precleared then the State retains the option of returning to the *status quo ante*. We recognize that this is a harsh result, but it is mandated by federal law.[16]

---

voting, and where the highest two vote-getters win, the election results in our hypothetical district could be as follows:

| | |
|---|---|
| minority candidate: | 40 votes |
| non-minority candidate # 1: | 50 votes |
| non-minority candidate # 2: | 35 votes |
| non-minority candidate # 3: | 35 votes |

In this situation, one minority candidate and one non-minority candidate would win, the minority voters all having voted for the minority candidate and having refused to cast any votes for majority candidates.

Although the non-minority vote need not necessarily so split, nonetheless under anti-single-shot provisions such a result would never obtain under polarized voting.

**14.** See *supra* note 12.

**15.** For example, in a district with a 30 per cent minority voting bloc, where there are only two posts, even in the absence of anti-single-shot provisions and even if the majority splits its vote with 35 per cent going to each position, the majority will defeat any minority choice which, assuming racial bloc voting, would have 30 per cent of the vote at most. When a third post is added, however, the anti-single-shot provision *does* make a difference because in its absence minority voters could elect a candidate by concentrating all its vote on one candidate.

**16.** The cannonade of the dissent is more deafening than persuasive, as the straw opinion it attacks simply is not the majority opinion. The majority had to determine whether the enactments in question have a *potential* for discrimi-

## IV.

█ It is undisputed that the defendants have not satisfied the requirements of Section 5. The defendants have not sought a declaratory judgment in the District of Columbia. Not only have they failed to preclear the changes with the Attorney General, but the Attorney General has notified the parties that he objects to the proposed changes in accordance with published regulations.[17]

The State has suggested that it is waiting to complete the section 2 case before it complies with the Attorney General's request for information. The defendants of course have that right, but that does not mean that the Attorney General must stop his consideration of the changes. As the Supreme Court has noted, the very purpose of section 5 is to require preclearance before changes can be put into effect, and to avoid using litigation by voters as the mechanism for testing changes in voting laws. *See e.g., McCain v. Lybrand,* 465 U.S. 236, 243–44, 104 S.Ct. 1037, 1042–43, 79 L.Ed.2d 271 (1984). If this court were to adopt the defendants' theory, and excuse

their failure to comply with the Attorney General's request for more information, it would undercut the core of section 5. The State's unilateral decision not to comply with the requirements of preclearance does not stay the operation of section 5.

█ We are mindful of the time that has elapsed since some of the changes were enacted. We cannot, however, "equitably preclear" any of the changes based on equity's rule of laches. *See McCain,* 465 U.S. at 249–52, 104 S.Ct. at 1046–47; *cf. Haith v. Martin,* 618 F.Supp. 410 (estoppel). Recognizing that the Attorney General could not keep track of changes relating to voting being made, Congress put the burden on the covered jurisdictions to seek preclearance to avoid the very problem we now face. We would do violence to the heart of section 5 if we were to excuse the State's failure to seek preclearance merely because the State has been disregarding section 5 for a long time. Moreover, Supreme Court precedent in this area is unambiguous. *Allen v. State Board of Elections,* 393 U.S. 544, 571, 89 S.Ct. 817, 834;

nation. We do not—indeed we cannot—decide whether these enactments are in fact discriminatory. *If* minority voters vote as a bloc, then the addition of judges can have a discriminatory effect. The dissent does not refute that assertion. Instead, it refuses to "assume that blacks or whites will always vote in racially polarized bloc patterns." So do we. We merely note that they *may* vote in such a pattern, and if so, then the addition of judges may have a discriminatory effect. We do not conclude that such a voting pattern will occur, and we certainly do not hope for such a result. We may not, however, assume that such polarized voting will *not* occur.

It may be that the Attorney General, in reviewing the evidence of prior voting patterns (evidence the Attorney General requested and that Georgia refused to provide), will determine that the potential discriminatory effect of these changes will not be realized. That determination is for the Attorney General, not this court.

Ironically the dissent takes us to task for "supplanting the will and wisdom of the elected Legislature of Georgia ..." when it would have us disobey the "will and wisdom" of the "elected legislature" of the United States embodied in the Voting Rights Act. That we cannot do. We share the concern expressed by the dissent over the potentially troubling effects of our decision upon the state judiciary. However, after careful study of the Voting Rights Act, its legislative

history, and its construction by the courts, we have concluded that the result herein is mandated by the will of Congress.

The dissent emphasizes the changing attitudes of American voters reflected in the growing number of minority elected officials. Given these changes, Judge Bowen asserts that the addition of judges actually will have no discriminatory effect and that the potential for discrimination is "imaginary." His conclusion is based on his belief in how voters will cast their ballots. We, however, must heed the Supreme Court's admonition in *Dougherty County, Georgia, Board of Education v. White:* "in determining if an enactment triggers § 5 scrutiny, the question is not whether the provision is in fact innocuous and likely to be approved, but whether it has a *potential* for discrimination." 439 U.S. at 42, 99 S.Ct. at 374 (emphasis in original). The addition of judges can have such a potential, and we are not free to "imagine" otherwise.

17. C.F.R. § 51.40 Failure to complete submissions.

If after 60 days the submitting authority has not provided further information in response to a request made pursuant to § 51.37(a), the Attorney General, absent extenuating circumstances and consistent with the burden of proof under Section 5 described in § 51.52(a) and (c), may object to the change, giving notice as specified in § 51.44.

*United States v. Sheffield Board of Commissioners*, 435 U.S. at 136, 98 S.Ct. at 981; *McCain v. Lybrand*, 465 U.S. at 249–51, 104 S.Ct. at 1045–46. Section 5 means what it says: absent preclearance, a covered change may not be enforced.

## V.

The final step for the three-judge court is to determine "what remedy is appropriate." Section 5 contemplates injunctive relief, which is by its nature equitable. Moreover, the Supreme Court has indicated that the three-judge court has some limited discretion in fashioning a remedy by directing that the court must fashion an "appropriate" remedy. *See e.g., Perkins v. Matthews*, 400 U.S. 379, 441, 91 S.Ct. 431, 441, 27 L.Ed.2d 476 (1971) (question of appropriate remedy for district court); *cf., N.A.A.C.P. v. Hampton County Election Comm'n*, 470 U.S. 166, 183, 105 S.Ct. 1128, 1138, 84 L.Ed.2d 124 (1985) (discretion of district court). Thus, we must exercise our discretion in fashioning the appropriate remedy for the case at hand.

■ As we discussed above, a three-judge court cannot rule that the covered changes have been "equitably precleared." At the other extreme, we are not required to rule, as the plaintiffs suggest, that the covered changes are void *ab initio*, retroactively rendering void any actions taken by a judge whose position is the result of a covered change that was not precleared. Granting such a remedy would result in the reversal of years of convictions, the overturning of myriad judgments; in short, it would create genuine chaos. The plaintiffs were irresponsible to suggest that this court follow such a course. We cannot stress too strongly that the validity of the actions taken by these judges is in no way implicated by our decision here.

■ The language of the statute— "*may* not be enforced"—suggests prospective relief. Moreover, in *Berry v. Doles*, 438 U.S. 190, 192, 98 S.Ct. 2692, 2693, 57 L.Ed.2d 693 (1978), and *N.A.A.C.P. v. Hampton County Election Commission*,

470 U.S. 166, 179, 105 S.Ct. 1128, 1135–36, 84 L.Ed.2d 124 (1985), the Supreme Court directed that appropriate relief under section 5 should include an order allowing 30 days for the state to submit the covered changes to the Attorney General for approval. *N.A.A.C.P. v. Hampton County*, 470 U.S. at 182, 105 S.Ct. at 1137; *Berry*, 438 U.S. at 192–93, 98 S.Ct. at 2693–94. Both these cases, however, involved situations where the covered changes had not been submitted to the Attorney General at all, and thus the Attorney General had not objected. Here, on the other hand, except for the five 1989 judgeships (not counting Bartow County) that were not submitted by Georgia for preclearance, the Attorney General has objected to the changes. Nevertheless, the Attorney General has expressed that he is "ready and willing to reconsider" his determination, and we will take him at his word.[18] Thus, we believe it is appropriate for us to follow the course set out in *Berry* and *N.A.A.C.P. v. Hampton County*.

The defendants, therefore, have thirty days in which to comply fully with the Attorney General's prior request for information and to request reconsideration from the Attorney General of his objection to the proposed changes. *See generally* 28 C.F.R. § 51.45. The defendants, however, will not be allowed to use the preclearance procedure in any dilatory manner at this late stage. Under the dictates of *Berry* and *N.A.A.C.P. v. Hampton County*, defendants have 30 days in which to *complete* their submission to the Attorney General, and they may of course request expedited consideration under 28 C.F.R. § 51.-34. The defendants may not comply piecemeal and seek to stretch out the preclearance process.

In *N.A.A.C.P. v. Hampton County* the Court directed that

> [i]f appellees fail to seek this approval [from the Attorney General], or if the approval is not forthcoming, the results of the [ ] election should be set aside. If, however, the Attorney General determines that the changes had no discrimi-

---

**18.** *See also* 28 C.F.R. § 51.45 (procedure governing requests for reconsideration).

natory purpose or effect, the District Court should determine, in the exercise of its equitable discretion, whether the results of the election may stand. 470 U.S. at 182–83, 105 S.Ct. at 1137–38.

We turn now to the appropriate remedy on the one hand, if the defendants fail to seek reconsideration from the Attorney General or if the Attorney General objects to a covered change, or on the other hand, if the Attorney General concludes that a covered change does not have a discriminatory purpose or effect. We first will consider the latter alternative.

If, on reconsideration, the Attorney General concludes that a given change does not have a discriminatory purpose or effect, then we believe, in the exercise of our equitable discretion, that an election under that change should be allowed to stand. In so concluding, we note that until 1986, the date of the Supreme Court's summary affirmance of *Haith v. Martin*, it was not unequivocally clear that section 5 applied to the election of judges. *See Perkins v. Matthews*, 400 U.S. 379, 394, 396, 91 S.Ct. 431, 439–40, 441, 27 L.Ed.2d 476 (1971) ("in determining the appropriate remedy, other factors may be relevant, such as the nature of the changes complained of, and whether it was reasonably clear at the time of the election that the changes were covered by § 5"). We also recognize the upheaval in the State judiciary that would result if we were to set aside the elections of a significant number of Superior Court judges. We are not unmindful of the fact that the State itself is responsible for the consequences of its failure to comply with the provisions of section 5, yet we believe that the potential harm to the people of the State of Georgia outweighs the potential harm (if any) of allowing the elections to stand. Thus, if the Attorney General finds that a change does not have a discriminatory purpose or effect, then the election under that change (i.e., that particular additional judgeship) shall stand. Similarly, if the Attorney General concludes that the changes enacted in 1989 do not have a discriminatory purpose or effect, then the Governor may fill those positions.

We turn now to the more problematic issues. Should the defendants fail to seek reconsideration from the Attorney General within the 30 days permitted, or should the Attorney General decline to reconsider his prior objection, or should he, upon reconsideration, conclude that a particular change has a discriminatory purpose or effect, then we must afford some affirmative relief. *N.A.A.C.P. v. Hampton County* suggests, "the election should be set aside," *N.A.A.C.P. v. Hampton County,* 470 U.S. at 183, 105 S.Ct. at 1137–38, but this is not our only remedy. *Cf. Perkins v. Matthews,* 400 U.S. at 395, 91 S.Ct. at 440 (declining to set aside election).

We have no difficulty holding that the Governor may not appoint judges to any non-pre-cleared position created in 1989 until that position has been precleared. Further, we hold that in the case of a judgeship added to a pre-existing circuit, no further election can be held for that position if the position is not precleared. However, we believe it a proper exercise of our equitable discretion to permit incumbents to serve out their full terms, and do not declare unprecleared judgeships added to circuits with unchanged boundaries void until the date of the next scheduled election for the position.

*Allen v. State Board of Elections,* 393 U.S. 544, 569, 89 S.Ct. 817, 833, 22 L.Ed.2d 1 (1969) is instructive. In *Allen* the Court refused to set aside the elections at issue because, "[t]hese § 5 coverage questions involve complex issues of first impression—issues subject to rational disagreement. The state enactments were not so clearly subject to section 5 that the [state's] failure to submit them for approval constituted deliberate defiance of the [Voting Rights] Act." 393 U.S. at 572, 89 S.Ct. at 835. As noted above, *see* supra Part III.A, the applicability of section 5 to the election of judges has, until recently, been a "subject of rational disagreement." Thus, *Allen* suggests that it is within our discretion in fashioning the appropriate remedy to permit an incumbent to serve out a term of office.

If we were to set aside numerous judgeships abruptly, the remaining judges would be overwhelmed by the resulting increase in work and the court system thrown into disarray. This would be harmful to all citizens of the State, including minorities. On the other hand, permitting these judges to serve out their term will not significantly injure the plaintiffs.

Thus, if the defendants fail to obtain approval of a change that adds a judgeship to a preexisting circuit we believe it best to allow the incumbent to serve out his term of office. If the Attorney General concludes that any of the judgeships created in 1989 has the purpose or effect of discrimination, then that post may not be filled, either by appointment or election.

■ We turn finally to the circuits that have been redistricted. If, upon resubmission and reconsideration, the Attorney General continues to object to the redistricting, then we have no choice but to enforce the prior districting plan. As discussed earlier, *all* judgeships in these redistricted circuits are implicated by the State's failure to preclear the changes. Thus, again weighing the equities, we believe that the appropriate remedy in the event the defendants do not obtain preclearance is to direct that at the next regularly scheduled election the affected circuits shall revert to the prior districting plan and the previous number of judgeships, with the additional judgeships then terminating, even if, under the staggered term system, there remains time in the elected terms.

## VI.

We are fully aware of the gravity of our decision here. We also are constrained to note that we have come to these conclusions reluctantly. Nevertheless, the State has pointed to no authority to suggest that section 5 does not apply to the election of judges, nor has the State been able to show that the addition of judges is not a covered change within the scope of section 5. By the same token, the State has failed to adduce any precedent that might justify its deliberate decision not to comply with the Attorney General's request for information, a decision that has forced us ineluctably to take the steps we have here.

Accordingly, following the explicit language of section 5 of the Voting Rights Act and Supreme Court precedent, we conclude that section 5 applies to the election of judges. We also conclude that the specific changes at issue here are covered changes that must trigger section 5 scrutiny. We further find that these covered changes have not been precleared as section 5 requires. Therefore, as detailed above, because these changes have not been precleared, Congress has directed they "may not be enforced."

SO ORDERED.

APPENDIX A

| Year | Act | Judicial Circuits |
|---|---|---|
| 1967 | 93 | Clayton |
| 1967 | 99 | Blue Ridge |
| 1968 | 768 (amending 1967 Act 93) | Clayton |
| 1967 | 175 | Northeastern |
| 1971 | 28 | Tallapoosa |
| 1972 | 852 | Rome |
| 1972 | 1091 | Gwinnett |
| 1972 | 1557 | Cobb |
| 1974 | 859 | Conasauga |
| 1977 | 237 | Clayton |
| 1977 | 291 | Tallapoosa |
| 1977 | 353 | Gwinnett |
| 1978 | 1007 | Lookout Mountain |
| 1978 | 1013 | Cherokee |
| 1978 | 1016 | Cobb |
| 1980 | 944 | Tallapoosa |
| 1980 | 944 | Douglas |

| Year | Act | Judicial Circuits |
|------|-----|-------------------|
| 1980 | 1016 | Rome |
| 1981 | 119 | Mountain |
| 1981 | 122 | Conasauga |
| 1981 | 524 | Douglas |
| 1982 | 862 | Cobb |
| 1982 | 863 | Gwinnett |
| 1982 | 865 | Rockdale |
| 1983 | 364 | Appalachian |
| 1984 | 827 | Cobb |
| 1984 | 850 | Clayton |
| 1986 | 933 | Northeastern |
| 1986 | 934 | Piedmont |
| 1987 | 495 | Gwinnett |
| 1987 | 547 | Cobb |
| 1988 | 915 | Appalachian |

## APPENDIX B
### Changes to which the Attorney General has Objected

| Year | Act | Judicial Circuits |
|------|-----|-------------------|
| 1967 | 100 | Stone Mountain |
| 1967 | 101 | Brunswick |
| 1968 | 746 | Ocmulgee |
| 1969 | 183 | Southern |
| 1969 | 303 (amended 1971 Act 587) | Houston |
| 1969 | 616 | Chattahoochie |
| 1971 | 457 | Augusta |
| 1971 | 802 | Atlanta |
| 1971 | 810 | Atlantic |
| 1972 | 849 | Alcovy |
| 1972 | 1194 | Stone Mountain |
| 1974 | 849 | Coweta |
| 1974 | 850 | Atlanta |
| 1974 | 857 | Waycross |
| 1974 | 858 | Dougherty |
| 1975 | 115 | Southern |
| 1975 | 503 | Flint |
| 1976 | 996 | Western |
| 1976 | 1108 | Oconee |
| 1977 | 244 | Middle |
| 1977 | 247 | Northern |
| 1977 | 293 | Griffin |
| 1977 | 336 | Chattahoochie |
| 1977 | 340 | Alapaha |
| 1978 | 1017 | South Georgia |
| 1978 | 1076 | Ogeechee |
| 1978 | 1082 | Alcovy |
| 1979 | 479 | Ocmulgee |
| 1979 | 515 | Eastern |
| 1980 | 725 | Dublin |
| 1980 | 978 | Tifton |
| 1980 | 1078 | Brunswick |
| 1980 | 1209 | Cordele |
| 1980 | 1350 | Coweta |
| 1981 | 101 | Southwestern |
| 1981 | 107 | Waycross |
| 1981 | 123 | Toombs |
| 1981 | 124 | Pataula |
| 1981 | 772 | Macon |
| 1982 | 860 | Atlantic |
| 1984 | 845 | Atlanta |
| 1984 | 851 | Houston |

| Year | Act | Judicial Circuits |
|------|-----|-------------------|
| 1986 | 1336 | Augusta |
| 1986 | 1339 | Stone Mountain |
| 1987 | 315 | Griffin |
| 1987 | 743 | Brunswick |
| 1988 | 911 | Stone Mountain |

## APPENDIX C
### Non–Precleared Judgeships Created in 1989

| Act | Circuit |
|-----|---------|
| S.B. 142 | Southern Judicial Circuit |
| H.B. 559 | Chattahoochee Judicial Circuit |
| H.B. 306 | Eastern Judicial Circuit |
| S.B. 167 | Atlantic Judicial Circuit |
| H.B. 721 | Atlanta Judicial Circuit |

BOWEN, District Judge, concurring in part, dissenting in part:

With portions of the majority opinion in this case, I concur; as to its treatment of the most straightforward issue, I dissent.

The majority opinion has all of the indicia of apparent validity: a balanced statement of the facts; a wealth of citations and case references; and a scholarly style. Nevertheless, it is incorrect on the most important point in the case. I have no quarrel with the majority opinion through and including section III(B)(1) thereof. Like it or not, where there are changes in the geography of a judicial circuit within a "covered jurisdiction", the Attorney General's preclearance is required. Indeed, the need for preclearance of the legislative enactments which change the geography of a judicial circuit has never been seriously questioned in this case. Under present law, every change in the demography of a judicial circuit requires preclearance.

Nor do I have any question in my mind that *Haith*, in its summary affirmance posture, stands for the proposition that the Voting Rights Act applies to judicial electoral procedures. However, in the laborious research which the parties and this Court have performed, there is no binding precedent that the mere increase in the number of judges in an existing, otherwise validly composed judicial circuit, is a change in a "standard, practice, or procedure with respect to voting."

The majority believes that a duplication or other multiplication of the *status quo*, by the mere addition of a judgeship, is a covered change because of a perceived "potential for discrimination" therein. The proffered potential for discrimination is imaginary. This potential for discrimination (a) presumes the existence of factors which are not grounded in fact; and, (b) presupposes that some novel and ingenious method might be crafted to accommodate the wishes of plaintiffs and their class whenever a new judgeship is needed. While it is true that only a potential for discrimination, not a discriminatory purpose or effect, must be shown, the acceptance of the genuineness of the potential for discrimination proffered by the plaintiffs in this case requires a degree of credulity which I cannot muster, even under the liberal construction principles of the Voting Rights Act.

The majority sees a potential for discrimination in the addition of a judgeship to an existing district because the added judge must be appointed by the governor, must later run for designated post, and must be elected by a majority vote in a circuit-wide election. In other words, there is a "potential for discrimination" because the new judge will obtain and hold office in the same way as every Superior Court judge in Georgia! Also, the majority sees a potential for discrimination because, when additional judges are needed to handle the judicial business of a district, the Legislature has not crafted the boundaries of districts so as to produce a select constituency which will elect a judge through the racially polarized bloc vote of the plaintiff class. This proposition is based upon erroneous assumptions and logical fallacies.

I live in a Georgia city which elected a black mayor by majority vote in a 1981 city-wide election. Our county commission has thrice been chaired by a black man. A black Superior Court judge runs unopposed for re-election. The man who will soon occupy the governor's office in the former capital of the Confederacy is part Negro. Yet, I am supposed to assume that whites and blacks always vote in racially polarized bloc patterns. Common sense tells me I cannot. If Georgia is ever to emerge from the indignity of federal scrutiny of electoral minutiae, it will occur by assuming the positive, not the negative. Similarly, I observe that in my experience nothing has done more to perpetuate racial polarization and promote misunderstanding between well-intended citizens than the frictions inherent in the continued selective application of the Voting Rights Act. Furthermore, I can imagine no set of facts more likely to foster racial bloc voting than the "single-shot" voting tactic to which the majority refers in Section III of their opinion (see footnote 12).

Judicial service is unique in government. Judges are human, but we are obliged to adhere to certain fictions relative to judicial service. For example, judges are fair, impartial, and serve only to do equal justice in the cases that come before them, regardless of the race, position, station in life, affiliation or connection of the parties therein. These properties in the compound of judicial service are recognized by the highest legal authority. "State judges as well as federal judges swear allegiance to the Constitution of the United States, and there is no reason to think that because of their frequent differences of opinions as to how that document should be interpreted, all are not doing their mortal best to discharge their oath of office." *Sumner v. Mata,* 449 U.S. 539, 549, 101 S.Ct. 764, 770, 66 L.Ed.2d 722 (1981).

Any suggestion that the Legislature of Georgia might seriously entertain the notion of gerrymandering within one or more of its judicial circuits a precinct, wherein a person preferred by the plaintiff class might assuredly be elected, is anathematic and inimical to all Anglo–American tenets

of judicial independence and impartiality. Every Negro and every Caucasian is entitled to the same fair justice from a Superior Court judge, regardless of the race of the judge or the race of the majority who may have elected that judge. Obviously, a judge cannot have a constituency in the usual sense.

A judge does not sit upon a board or commission and represents no group or district. A Superior Court judge presides alone, with county-wide jurisdiction, in the courts of the counties of his judicial circuit. In appropriate circumstances, a Superior Court judge may be detailed to serve outside the home circuit.

The county is the smallest unit or precinct which can be practically utilized in the election of Superior Court judges. Given the county-wide jurisdiction of a Superior Court judge, it would be wholly inappropriate for such a judge to be elected by any group smaller than the constituency of the county as a whole. The suggestion that the Legislature might develop some plan to provide a "safe district" to assure the election of a candidate chosen by the plaintiff class is rank speculation. There are 159 counties and 45 judicial circuits in Georgia. This case alone involves 43 added judgeships. The options open to the Legislature are limited. Confusion is the only likely result of an attempt to "gerrymander" the counties so as to assure the election of the judicial candidate of a racial group.

The majority is willing to adopt the plaintiffs' vernacular, "anti single-shot provisions." I am not. While majority-vote, designated-post, circuit-wide election rules may be called "anti single-shot" provisions by some, I am prepared only to refer to such rules as a uniform, state-wide, fair and consistently applied system for the selection and maintenance of a highly qualified, dedicated judiciary. The "single-shot" voting technique described by the majority, as applied to the election of a Superior Court judge, makes my hair stand on end. Such "single-shot" tactics are unlikely to result in a judicial selection which is based upon qualifications and judicial temperament. A voting plan which is otherwise

valid, but does not permit such "single-shot" tactics in the election of judges, is not thereby necessarily infected with a potential for discrimination. In this case, in each of the judicial circuits to which judgeships have been added, the Legislature has done no more than increase the number of judges by a method which, admirably, conforms every Superior Court judgeship in the state to the same process. Thus, there are independent and very legitimate reasons for the continuation of the existing election procedures when a new judgeship is added to a judicial circuit.

The majority identifies the mere addition of a judgeship in an existing district as a potential for discrimination because "if another judicial post is added . . ., such provisions may well be thwarting what would otherwise be an opportunity to conduct a successful single-shot voting campaign." This logic assumes that with the creation of each additional judgeship, the Legislature can concoct some discrete voting procedure, applicable to that judicial circuit alone, which, by boundary alignment, "single-shot" voting practices or otherwise, will advance the interests of the plaintiff class. The implicit assumption that the legislature might be willing to discard a working uniform, state-wide procedure for the selection of all Superior Court judges, and steer a new course leading to different procedures for each circuit, is preposterous. Because Superior Court judges have county-wide jurisdiction within their circuits, because they may, on occasion, be designated from one circuit to another, and because their courts are vested with general civil and criminal jurisdiction in each of the counties of the State of Georgia, the state has a palpable, genuine, independent, legitimate interest in maintaining a uniform method of selecting Superior Court judges of high caliber. This interest far outweighs any concern which the majority should have for a volubly touted "potential for discrimination" which, at best, is hypothetical and ephemeral.

In short, the majority has decided that the Legislature of Georgia has not done what it could never be expected to do in the first place. Even in a voting rights case a

potential for discrimination should be more than a chimera. To provide a basis for such drastic relief, a potential for discrimination should, at the least, be genuine and reasonable. I cannot conclude that some affirmative action-based "balkanization" of judicial voting procedures across the state is a likely or appropriate prospect. The proffered potential for discrimination, therefore, is neither genuine nor reasonable.

Finally, it is unfair to describe the existing plan for electing most of the Superior Court judges of this state as containing "anti single-shot provisions." The laws which provide for the selection of Georgia's judges, many of which have been precleared, are not "anti-anything." They are simply an extension of existing provisions which draw the highly desirable mantle of uniformity over each such position existing within the State of Georgia.

While I will not engage in what might be termed "result oriented" logic, I will express my concern for the far-reaching effect of the majority's conclusion in this case. The decision regarding changes in circuit boundaries affects relatively few counties and judges. Relief in the form of a return to the last valid plan is workable, albeit burdensome. However, the decision as to 43 added judgeships is a wholesale and unwarranted intrusion into Georgia's judicial system and the fundamentals of federalism.

In the palliative language of Section V of their opinion, the majority recognizes the chaos which would certainly result if the elections of sitting judges were invalidated. The apologia of Section VI, the relatively mild form of relief ordered, and the majority's assurances to the contrary notwithstanding, this court's decision as to judgeships added over the years will, if implemented, work much mischief, hardship and expense within the State of Georgia for years to come. Despite the majority's anticipatory comment, "the validity of the actions taken by these judges is in no way implicated by our decision here," many unhappy litigants in civil and criminal cases may raise that question anew. My imagi-

nation is not broad enough to estimate the number and the cost of the resultant habeas corpus proceedings alone. Even if unsuccessful, such cases will be filed and the state will be forced to defend them.

In this action the role of the three-judge court is indeed limited. With respect to the creation of new judgeships in existing circuits, our sole inquiry is whether the proposed change falls within Section 5. My view is that a mere change in the *number* of judges is not a change with respect to the *election* of judges. There is at issue here no standard, practice, or procedure with respect to voting different from that already precleared or in force as of November 1, 1964. There is no argument that the existing judicial circuits in which judgeships have been added are somehow otherwise infirm (see footnote 11). The mere replication of a judicial position in a circuit does not result in a covered change. If anything, the addition of a judgeship is a legislative reiteration of the *status quo*.

Congress intended the Voting Rights Act to cover judicial elections (see majority opinion Section III(A)). However, this conclusion does not end the inquiry into congressional intent. The plaintiffs' arguments, which the majority hasten to embrace, imply that Section 5 preclearance is an undertaking easily satisfied. However, as the defendants have demonstrated, preclearance is a laborious process which requires the submission of a tremendous amount of documentation. Preclearance is not accomplished by writing a simple letter. The onus on the state in compiling and organizing the information necessary to comply with the preclearance requirement is great. I cannot believe that the Congress intended to place upon "covered" states the burden of preclearing each new judgeship added to existing judicial circuits, where election procedures have already been precleared. The majority have cited no authority that such was Congress' intention in passing Section 5 of the Voting Rights Act. The case law cited by the majority merely holds that the Voting Rights Act should be liberally construed. However, this is not authority for the plaintiffs' proposition that adding judgeships to

existing judicial circuits using precleared election procedures is a change in a "standard, practice, or procedure with respect to voting."

The potentials for discrimination to which the majority anchor their reasoning is imaginary. The state's overriding independent, legitimate interest in maintaining a uniform election procedure is clearly shown. Accordingly, with respect to the issue of the addition of judgeships in existing circuits, the plaintiffs' complaint should be dismissed.

As do the majority, I have great concern about any relief to be ordered in this case. The one thing of which I am certain is that whatever the relief, it will serve to undermine the confidence of the public in the federal and state court systems and the judiciary as a whole. I agree with Judge Dubina when he said, "there is a real possibility that no fair, reasonable, and equitable remedy can ever be fashioned to redress whatever ... violations may exist in the instant case. Any remedy may only serve to further polarize the voting blocs which currently exist, and will almost certainly result in the removal from the bench of a number of decent, fair and competent state judges with many years of dedicated service. In remedying one injustice this court may, in effect, be creating others." *Southern Christian Leadership Conf. v. Siegelman*, 714 F.Supp. 511, 521 (M.D.Ala. 1989). We embark upon a dangerous voyage. We are about to supplant the will and wisdom of the elected Legislature of Georgia with decrees that are the product of the well-intended but inexperienced judicial mind. The Legislature has been creating judgeships for two hundred years. We have only just begun. As Justice Stevens cogently noted, "Because judges may not possess such expertise, however, I am afraid the Court is planting seeds that may produce an unexpected harvest." *Rogers v. Lodge*, 458 U.S. 613, 645, 102 S.Ct. 3272, 3290, 73 L.Ed.2d 1012 (1982) (Stevens, J., dissenting).

While I reject the proffered potential for discrimination which the majority adopts, while I cannot accept as a premise to any

decision the concept that blacks or whites will always vote in racially polarized bloc patterns, and while I disagree with the majority opinion that the mere addition of judgeships constitutes a covered change requiring preclearance by the Attorney General I am also constrained to say that the relief ordered by the majority is about as ameliorative as could be hoped under the circumstances.

Accordingly, with respect to the covered changes as to which I concur with the majority, I concur in the relief ordered. With respect to the judicial circuits where the number of judgeships has only been increased, I would deny any relief to plaintiffs.